(No. 39936.—

THE CHICAGO REAL ESTATE BOARD *et al.,* Appellants, *vs.* THE CITY OF CHICAGO *et al.,* Appellees.

*Opinion filed January 19, 1967.—Rehearing denied March 27, 1967.*

WILES, JOHNSON & BARRINGTON, of Chicago, (WALTER E. WILES, of counsel,) for appellants.

RAYMOND F. SIMON, Corporation Counsel, of Chicago, and SIDNEY R. DREBIN and WILLIAM R. MING, JR., Assistants Corporation Counsel, also of Chicago, for appellees.

PER CURIAM: Plaintiffs, Chicago Real Estate Board, an association of real-estate brokers, and certain individual

and corporate brokers, instituted this action against the city of Chicago, the Mayor, and the Chicago Commission on Human Relations to obtain a declaratory judgment on the constitutionality of the Chicago Fair Housing Ordinance, and to obtain an injunction prohibiting its enforcement. The circuit court of Cook County entered a declaratory decree sustaining the constitutionality of the ordinance and denying the injunction. The decree also dismissed the complaint as to the Real Estate Board on the ground that it was not a real-estate broker aggrieved by the ordinance, and therefore without standing to maintain this suit. From that decree plaintiffs have appealed to this court.

The issues presented for our determination are: whether the municipality has authority under Illinois law to adopt such an ordinance; whether the ordinance violates the due-process and equal-protection clauses of the constitution of the United States and of the State of Illinois; whether the ordinance violates the constitutional guarantees of freedom of speech and freedom from unlawful or unreasonable search and seizure; and whether the enforcement procedure of the ordinance complies with the requirements for procedural due process. The question of the standing of the Chicago Real Estate Board was not argued on this appeal.

Analysis of these issues requires review of the salient provisions of the ordinance, and also of the facts appearing in the record, inasmuch as this court cannot adjudicate rights in a vacuum, nor predicate decisions on legal concepts divorced from practical realities. *Jewel Tea Co.* v. *Industrial Com.* 6 Ill.2d 304, 316; *Vissering Mercantile Co.* v. *Annunzio,* 1 Ill.2d 108, 116.

The ordinance adopted by the city council of Chicago on September 11, 1963 declares it unlawful for real-estate brokers to discriminate on account of race, color, religion, national origin or ancestry in the sale, rental or financing of residential property in the city. The ordinance also declares, in substance, that it is unlawful for brokers to solicit

sales of property from white persons on the ground that loss of value will ensue because Negroes have moved or are about to move into a neighborhood, a practice commonly referred to as "panic peddling." In this connection it prohibits the distribution by brokers of any written material or statements designed to induce the owner to sell or lease his property for such reasons.

The administrative machinery for enforcement of the ordinance empowers the Commission on Human Relations to initiate or receive complaints charging violations of the law, to investigate them, and to conduct conciliation hearings. If such conciliation fails, the commission shall, after notice to all parties, hold a hearing on the complaint, in which oaths are administered and testimony taken, and make a written report and recommendations which shall be served on the parties within a specified time. The commission is empowered to recommend to the mayor in this report the suspension or revocation of the broker's license issued by the city if he is found guilty of violating the ordinance. Any broker whose license has been suspended or revoked, or any complainant aggrieved by the decision has the right of appeal under the Administrative Review Act. The mayor may also direct the corporation counsel to file with the Illinois Department of Registration and Education a complaint against any broker found violating the ordinance, seeking suspension or revocation of his State license.

According to the facts adduced by the parties, it appears that of the 3½ million population of Chicago, more than 900,000 are Negroes. An overwhelming number of them live, not entirely by choice, in blocks that are 90% to 100% Negro occupied. This pattern of segregation commenced about the time of World War I, when the expansion in Negro population in this area began. At that time discriminatory practices were openly advocated by the realtors on the assumption that property values would go down if Negroes moved into a neighborhood. It was urged that each

block be filled solid with Negroes, and that further expansion of the Negro population be confined to contiguous blocks and be enforced by "Jim Crow" ordinances.

After such laws were held unconstitutional (*Buchanan v. Warley,* 245 U.S. 60, 62 L. Ed. 149,) the realtors recommended that white property owners be organized for every white block to prevent Negro infiltration, and that restrictive covenants be used to bar their purchase or use of residential property. This discriminatory policy was reflected in the Real Estate Board's Code of Ethics which, until 1950, provided: "A realtor should never be instrumental in introducing into a neighborhood * * * members of any race or nationality or any individual whose presence would be clearly detrimental to property values in that neighborhood."

That Code of Ethics was changed in 1950, after a series of decisions by the United States Supreme Court (*Shelley v. Kraemer,* 334 U.S. 1, 92 L. Ed. 1161; *Hurd* v. *Hodge,* 334 U.S. 24, 92 L. Ed. 1187; and *Barrows* v. *Jackson,* 346 U.S. 249, 97 L. ed. 1587) established that the enforcement of restrictive covenants against Negroes, either by specific performance, or by an action for damages, constituted "State action," which violated the fourteenth amendment of the United States constitution. The realtor's Code of Ethics thereafter deleted the references to "race" and "nationality." It does not appear, however, that this change was accompanied by either any widespread re-education of members, nor that it produced any change in policy among realtors with respect to Negroes, according to the testimony of the executives of two of the largest real-estate brokerage establishments in the city.

One of these brokers testified that he knew that prior to September, 1963, there was a general practice among brokers not to submit the property in certain areas if the people were "of a certain religious group, and in other areas if they were of a certain racial group, and in other areas

if they were of a certain color." He admitted that this practice was not necessarily the result of a requirement in the exclusive listing contract with the owner, and that practices in 1963 before the Fair Housing Ordinance was passed were not any different than in 1948, before the Supreme Court of the United States held that restrictive covenants were unenforceable. After the enactment of the Fair Housing Ordinance in 1963, however, there was a complete change in policy.

Another broker testified that prior to September, 1963, his firm handled many properties which were shown only to white buyers, notwithstanding the fact that neither the listing agreements nor the management agreements contained any directions to the broker as to the race of people to whom the property could be shown. In fact, he had never seen a management or sales agreement which contained a directive as to the race, religion or national origin of the person to whom the property could be rented or sold. He stated further that it has been the practice of the industry for many years not to lease to Negro families in certain areas of Chicago.

In rebuttal, one of the plaintiffs testified that brokers made decisions to exclude Negroes as tenants or purchasers only on the basis of the owner's directions. However, not a single contract limiting the broker's action in that respect was introduced or cited.

With respect to the quality and cost of Negro housing in Chicago, according to the 1960 census returns, 82% of the housing occupied by white persons and 59% of the housing occupied by Negroes was classified as being in sound condition. The same median rental of $88 was shown for both white and colored persons.

Sociologists, and civic and religious leaders testified on the basis of their experience and on field studies, concerning the discriminatory practices in the housing market in Chi-

cago, the *de facto* segregation, and the serious problems created thereby for the city's educational institutions, its churches, and its law enforcement authority.

On the basis of this record, the circuit court entered a decree declaring that the city of Chicago had statutory power to pass the ordinance; that the ordinance was reasonable and violated no constitutional provision; that the injunction should be denied; and that the plaintiff Real Estate Board be dismissed since it is not a real-estate broker aggrieved by the ordinance.

The validity of this ordinance depends first upon whether it is within the purview of the powers of the city of Chicago. As a municipal corporation the city is without inherent power, and must rely upon powers expressly granted and those necessarily incident to such powers in order to adopt regulatory measures. *City of Chicago* v. *Mandel Bros.* 264 Ill. 206; *City of Chicago* v. *Wonder Heating and Ventilating Systems,* 345 Ill. 496; *Barnard & Miller* v. *City of Chicago,* 316 Ill. 519.

In support of its authority to enact the Fair Housing Ordinance the city of Chicago relies upon its expressly delegated power to regulate brokers conferred by State statute. Section 11—42—1 of the Cities and Villages Act, (Ill. Rev. Stat. 1965, chap. 24, par. 11—42—1,) originally enacted in 1871, provides: "The corporate authorities of each municipaliity may license, tax, and regulate auctioneers * * * brokers * * *". (Enumerating certain occupations.)

The power of municipalities to regulate brokers, conferred by this statute, was expressly saved by the following provision in the comprehensive State law regulating real-estate brokers and salesmen (Ill. Rev. Stat. 1965, chap. 114½, par. 17) : "Nothing in this Act contained shall affect the power of cities and villages to tax, license and regulate real estate brokers. The requirements hereof shall be *in addition to the requirements of any existing or future*

*ordinance* of any city or village so taxing, licensing or regulating real estate brokers." (Emphasis supplied.)

The case law, both before and after the passage of the comprehensive State law, had recognized the powers of a municipality to regulate brokers. *Braun* v. *City of Chicago,* 110 Ill. 186; *Village of Itasca* v. *Luehring,* 4 Ill.2d 426, 431.

Plaintiffs argue, however, that the "power to regulate" does not encompass the power to regulate with respect to civil rights, because that was not contemplated at the time the power to regulate was conferred in 1871. In support of this contention plaintiffs rely principally on *Arnold* v. *City of Chicago,* 387 Ill. 532, and *Ambassador East, Inc.* v. *City of Chicago,* 399 Ill. 359. In the *Arnold* case the court refused to imply that the city's power to regulate "money changers" included the power to regulate "currency exchanges," which was a distinct business unknown when the particular law was passed. In the *Ambassador East* case the court refused to imply power to regulate rents or permanent residents of hotels, where "hotels" were expressly excluded from the rent-control law. Those cases involving attempts to imply municipal power over businesses not listed in or expressly excluded from a law are in no way determinative in the case at bar, which involves the application of an express power to a designated occupation.

It would be unusual to construe the power "to regulate" to mean only the kind of regulation conceivably contemplated by the legislature in 1871, as plaintiffs suggest. That exercise in conjecture would be contrary not only to the policy of this court to maintain the resiliency of the law, (*Zelney* v. *Murphy,* 387 Ill. 492, 500; *Molitor* v. *Kaneland Com. Unit Dist.* 18 Ill.2d 26; *Amann* v. *Faidy,* 415 Ill. 422), but to the plain terms of the statute preserving, without qualifications, future regulations of brokers by municipalities. Ill. Rev. Stat. 1965, chap. 114½, par. 17.

The express power "to regulate" a particular business

has been held to include the power to enact police regulations for that business. (*City of Chicago* v. *Vokes,* 28 Ill.2d 475, 479; *Frazer* v. *City of Chicago,* 186 Ill. 480, 490; *Dean Milk Co.* v. *City of Chicago,* 385 Ill. 565, 574.) In the *Vokes* case it was held that by virtue of the city's power to regulate taxicabs, it could police that business and impose restrictions on it.

Police power is also conferred on a municipality by statute. Section 11—1—1 of the Cities and Villages Act, (Ill. Rev. Stat. 1965, chap. 24, par. 11—1—1,) which provides that "The corporate authorities of each municipality may pass and enforce all necessary police ordinances," has been construed to confer power to pass and enforce all police ordinances necessary to carry out powers delegated under other provisions of the law. *Consumers Co.* v. *City of Chicago,* 313 Ill. 408, 413; *City of Bloomington* v. *Wirrick,* 381 Ill. 347, 353; *City of Chicago* v. *Mandel Bros.* 264 Ill. 206, 209.

With respect to the authority of a municipality to enact anti-discrimination laws, the United States Supreme Court and the courts of other States have held that the municipality's power to regulate a particular business includes the power to prohibit discrimination in that business on grounds of color, race or religion. *District of Columbia* v. *Thompson Co.* 346 U.S. 100, 116, 117, 97 L. Ed. 1480; *Marshall* v. *Kansas City,* (Mo., 1962), 355 S.W.2d 877; *Porter* v. *City of Oberlin,* 1 Ohio St. 2d 143, 205 N.E.2d 363.

In *District of Columbia* v. *Thompson Co.* the United States Supreme Court held that a law imposing a fine and forfeiture of a restaurant license for violation of the prohibition against discrimination on account of race or color was within the power of the local government to regulate the business of restaurants. The court reasoned that the regulation of public eating and drinking establishments had been delegated to the municipal government, and that the equal service requirements were "*regulatory* laws prescrib-

ing in terms of civil rights the duties of restaurant owners to members of the public." The court explained: "Like the regulations of wages and hours of work, the employment of minors, and the requirement that restaurants have flame-proof draperies, *these laws merely regulate a licensed business.*" (Emphasis supplied.)

The *Thompson* case was followed by the Missouri court in *Marshall* v. *Kansas City,* 355 S.W.2d 877, 883. There an ordinance making it unlawful for restaurants and motels to refuse to serve or accommodate any person for any reason relating to race or color was held to be within the authority of the municipality under the "specific grant of power to regulate restaurants," as well as under its police power.

Inasmuch as the courts in both of these cases relied upon the specifically delegated power to regulate the particular business, they cannot be summarily distinguished, as plaintiffs suggest, on the ground that they involve Home Rule cities. Home Rule was in no way the basis for those decisions, nor was it in *Porter* v. *City of Oberlin,* 1 Ohio St. 2d 143, 205 N.E.2d 363, where the Ohio court held that a municipality had authority to pass an ordinance against discrimination in housing under its police power.

Analogy cannot properly be made to *Nance* v. *Mayflower Tavern,* 106 Utah 517, 150 P.2d 773, cited by plaintiffs, since the Utah court predicated its decision that the municipality had no power to create an action for damages for denial of civil rights upon the fact that Utah, in contrast to Illinois, had no civil rights laws of any kind. The *Nance* case was not even alluded to in the decision in the *Thompson* case, and was expressly rejected in the *Marshall* case.

Nor is the Nebraska case of *Midwest Employers Council* v. *City of Omaha,* 177 Neb. 877, 131 N.W.2d 609, persuasive, inasmuch as the city's authority to pass a fair employment ordinance was denied on the ground that the State had

preempted the field. Here the Illinois law regulating real-estate brokers expressly preserved the municipality's right to regulate brokers.

From this review of the Illinois statutes and the case law, we conclude that the city of Chicago had authority to adopt the Fair Housing Ordinance, which imposed restrictions on real-estate brokers, under its express power to regulate real-estate brokers and its police power incidental thereto.

Plaintiffs insist further that the Fair Housing Ordinance denies them both due process and equal protection of the law in violation of the Federal and State constitutions. (U.S. Const. amend. XIV; Ill. Const., art. II, sec. 2, art. II, sec. 14, and art. IV, sec. 22.). Plaintiffs' position is that the ordinance, by prohibiting only real-estate brokers from discriminating on grounds of race, color, religion and national origin and ancestry in the sale, rental or financing of property, is not reasonably related to its statutory purpose of eliminating discrimination in housing, and creates an arbitrary classification.

Although plaintiffs have interwoven their arguments relating to the constitutional questions of due process and equal protection, in the interest of clarity and conformity with the case law this court shall consider these issues separately.

In determining whether a particular law violates the due-process guarantees in Federal and State constitutions, courts have acknowledged that the concept of due process of law has never insulated a business from regulations deemed essential under the police power. (*Colorado Anti-Discrimination Com.* v. *Case,* 151 Colo. 235, 380 P.2d 34, 41; *Nebbia* v. *New York,* 291 U.S. 502, 523, 78 L. Ed. 940.) The inquiry in due process cases has been whether the evil existed which affected the public health, safety, morals or general welfare, and whether the legislative means chosen to counter that evil were reasonable. If so,

there is a proper exercise of the "elastic police power," and no want of due process, despite interference with individual property and contract rights. *Zelney* v. *Murphy,* 387 Ill. 492, 500; *Williamson* v. *Lee Optical of Oklahoma, Inc.* 348 U.S. 483, 488, 99 L. Ed. 563.

In applying that criterion to laws prohibiting discrimination in housing, the courts have first expounded on the evil effects of such discrimination on the public welfare. They have emphasized that discrimination leads to lack of adequate housing for minority groups, which results in slum conditions, disease, crime and immorality, which endangers the entire community. *Burks v. Poppy Const. Co.* 57 Cal. 2d 463, 370 P.2d 313, 317; *Levitt & Sons* v. *State Div. Against Discrimination,* 31 N.J. 514, 158 A. 2d 177, 186; *Massachusetts Com. Against Discrimination* v. *Colangelo,* 344 Mass. 387, 394, 182 N.E.2d 595.

Courts have then reasoned that laws prohibiting discrimination in housing are reasonably calculated to counter such evils, and "bring substantial progress toward the elimination of such deleterious situations." Consequently, such laws have been repeatedly sustained as a proper exercise of the police power, and not an infringement of due process of law. *Colorado Anti-Discrimination Com.* v. *Case,* 151 Colo. 235, 380 P.2d 34, 41 : *Jones* v. *Haridor Realty Corp.* 37 N.J. 384, 181 A. 2d 481; *Massachusetts Com. Against Discrimination* v. *Colangelo,* 344 Mass. 387, 182 N.E. 595, 600.

Some of the cases sustaining the constitutionality of anti-discrimination housing laws have buttressed their conclusion that there is no denial of due process by making analogy to the laws prohibiting discrimination in places of public accommodation. *Burks* v. *Poppy Constr. Co.* 57 Cal. 2d 463, 370 P.2d 313, 317; *Massachusetts Com. Against Discrimination* v. *Colangelo,* 344 Mass. 387.

In resolving whether there is a reasonable relationship between the particular law prohibiting housing discrimina-

tion and the evil to be remedied, courts have admonished that the legislative discretion should not be disturbed unless it is clearly erroneous. *Porter* v. *City of Oberlin,* 1 Ohio St. 2d 143, 205 N.E.2d 363; *Massachusetts Com. Against Discrimination* v. *Colangelo,* 344 Mass. 387, 394, 182 N.E.2d 595, 499-600.

In the *Porter* case the court emphasized that this particular question depended largely on local conditions, and that "local authorities are presumed to be familiar with local conditions, and to know the needs of the community."

In the instant case, from the evidence in the record it cannot be said that this anti-discrimination housing ordinance is not directed at, or fails to alleviate in some measure the social ills set forth in the record and recognized in the judicial decisions. In any event, there is no palpable abuse of power or of legislative discretion. The ordinance, therefore, cannot be deemed a denial of property without due process of law, even though it may interfere with the rights of plaintiffs to contract with persons of their choice.

That conclusion is in accordance with our decision in *Pickett* v. *Kuchan,* 323 Ill. 138, 140, holding that there was no deprivation of due process even though the law prohibiting discrimination in places of public accommodation interfered with the theatre owner's freedom of contract.

Plaintiffs' arguments relating to the coverage of the law and the alleged arbitrary classification, are more properly addressed to the issue, considered next, of whether the ordinance denied them equal protection of the law. That issue is the pivotal question in this case.

The concept of "equal protection of the law" has been judicially dissected in countless cases. The terse explication of the concept by Mr. Justice Holmes in *Patsone* v. *Pennsylvania,* 232 U.S. 138, 144, 58 L. Ed. 539, has found favor among jurists: "But we start with the general consideration that a state may classify with reference to the evil to be prevented, and that if the class discriminated against is

or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. * * * The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. *It is not enough to invalidate the law that others may do the same thing and go unpunished if, as a matter of fact, it is found that the danger is characteristic of the class named.* [Citation.] The state 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuse.' " (Emphasis supplied.)

That concept of equal protection was followed in *Railway Express Agency* v. *New York,* 336 U.S. 106, 110, 93 L. Ed. 533, 539, where the opinion contained the statement that, "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." The operative facts of the classification there are analogous to those in the case at bar. A New York City ordinance prohibited from the streets vehicles on which advertising space was sold, but did not bar vehicles carrying the advertising of the owner. The court, as in the instant case, first rejected the due-process argument on the ground that the local authorities had determined that an ordinance prohibiting advertising on vehicles on public streets created traffic problems by distracting drivers and pedestrians, and nothing had been advanced to show that conclusion to be palpably false.

The court then considered whether the law denied equal protection by prohibiting only vehicles carrying the advertising of others, since the distracting traffic hazard was present where vehicles carried the owner's advertising. In that same vein, plaintiffs here argue that the evils of housing discrimination are present whether it is done by brokers who sell their services, or by owners, yet only brokers are restricted.

In concluding that the classification was not a denial

of equal protection of the law, the court stated: "The local authorities may well have concluded that those who advertise their own wares on their trucks do not present the same traffic problem in view of the *nature or extent* of the advertising which they use. It would take a degree of omniscience which we lack to say that such is not the case. If that judgment is correct, the advertising displays that are exempt have less incidence on traffic than those of appellants. We cannot say that that judgment is not an allowable one. Yet if it is, the classification has relation to the purpose for which it is made and does not contain the kind of discrimination against which the Equal Protection Clause affords protection. It is by such *practical considerations based on experience* rather than by theoretical inconsistencies that the question of equal protection is to be answered." (Emphasis supplied.)

This emphasis on "experience" in deciding equal-protection questions, and the necessity for viewing conduct "in the context of actuality," was also expressed by the Supreme Court in *Tigner* v. *Texas,* 310 U.S. 141, 84 L. Ed. 1124. The United States Supreme Court has also repeatedly reaffirmed that where a law involves reform "it may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson* v. *Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489; *Morey* v. *Doud,* 354 U.S. 457, 465, 1 L. Ed. 2d 1485.

The Illinois courts have articulated the same principles adhered to by the United States Supreme Court with respect to classifications. (*Gadlin* v. *Auditor of Public Accounts,* 414 Ill. 89, 98; *People* v. *Saltis,* 328 Ill. 494, 499.) In the *Gadlin* case, where the court sustained a classification between banks and currency exchanges, it was stated at page 98: "The legislature is under no duty to extend regulatory measures to all fields in which there may be abuses, and it may confine its restrictions to those classes of cases where the need is deemed to be the clearest."

In *People* v. *Saltis,* 328 Ill. 494, 497, a law prohibiting the carrying of concealed weapons excepted certain employees of railroads and express companies but not other persons who also required self-protection and had like duties, and it was argued that the classification had no reasonable relation to the purpose intended. The court, after explaining that the object of the legislation was to protect the public against crimes of violence, which are encouraged by the custom of carrying weapons, stated: "It is a legislative question whether an evil exists which requires means to be taken for its suppression and what those means shall be, and its acts to that end will not be interfered with unless clearly in violation of some constitutional limitation. The legislature may consider degrees of evil and is not bound to pass such a law as will meet every case. It has a wide discretion in classifying the objects of its legislation and such classification need not be scientific or logically appropriate. If uniform within the class and not palpably arbitrary it will be sufficient."

Where the equal-protection concept has been invoked to challenge the diverse classifications in laws prohibiting discrimination in housing, the overwhelming majority of the cases have sustained the constitutionality of such laws. See discussion in 16 Stanford Law Review 849, Survey: Fair Housing Laws; 52 Cal. L. Rev. 1, 46, 14th amend. Aspects of Racial Discrimination.

Thus, courts have sustained a classification prohibiting discrimination on grounds of race or color by owners whose financing was publicly assisted, but not by owners of privately financed property. (*Levitt & Sons, Inc.* v. *State Div. Against Discrimination,* 31 N.J. 514, 158 A. 2d 177, 186-187. (appeal dismissed for lack of Federal question, 363 U.S. 418); *New York State Com. Against Discrimination* v. *Pelham Hall Apts.* 170 N.Y.S.2d 750; *Burks* v. *Poppy Const. Co.* 57 Cal. 2d 463, 370 P.2d 313, 320.) A contrary conclusion reached by a closely divided court in *O'Meara* v.

*Washington State Bd.,* 58 Wash.2d 793, 365 P.2d 1, has been rejected by the courts in other States, (*Burks* v. *Poppy Const. Co.* 57 Cal.2d 463; *N.J. Home Builder's Ass'n* v. *Div. of Civil Rights,* 81 N.J. Super. 243,. 195 A.2d 318, 329,) and criticized by legal scholars. 16 Stanford Law Review 849.

In the *Levitt* case, in holding that the anti-discrimination housing law did not violate the equal-protection clauses of the Federal or State constitutions, the New Jersey court emphasized that merely showing that others are equally guilty of housing discrimination, or that the legislative objective could be more fully achieved by greater coverage in the anti-discrimination law, is insufficient to render the classification arbitrary. The court concluded that under the step-by-step approach, applicable to such laws, choosing as a legislative target the housing "most easily financed" was neither an unreasonable means of accomplishing the legislative goal, nor an arbitrary classification. That reasoning was followed by the California court in the *Burks* case.

The courts have also sustained the constitutionality of classifications which prohibit discrimination in private housing of a certain number of units, but not in housing with a lesser number of units. *Porter* v. *City of Oberlin,* 1 Ohio St. 2d 143, 205 N.E.2d 363, 369-370; *N.J. Home Builders Ass'n* v. *Div. of Civil Rights,* (81 N.J. Super. 243,) 195 A.2d 318, 326-328; *Massachusetts Com. Against Discrimination* v. *Colangelo,* 344 Mass. 387, 182 N.E.2d 595, 599; *Colorado Anti-Discrimination Com.* v. *Case,* 151 Colo. 235, 380 P.2d 34, 42.

In *N.J. Home Builders Ass'n* v. *Div. of Civil Rights,* the court recognized that the legislature, by including within the sphere of an anti-discrimination law only certain kinds of property, did not exhaust the area of discrimination, but proceeded "in a manner consistent with what it believed to be the immediaate public need." The court rejected the contention, similar to that interposed by plaintiffs here, that the

class was too small and should have included the entire area of discrimination in private housing.

Similarly, in *Porter* v. *City of Oberlin,* 1 Ohio St. 2d 143, 205 N.E.2d 363, at page 370, the court commented: "Certainly a legislative body is not unreasonable because it elects to proceed slowly in such an emotionally involved field as race relations."

Plaintiffs, however, argue that these cases are of no persuasive value since they involved laws covering owners as well as brokers, whereas the Chicago ordinance restricts only brokers. This argument is untenable. Those decisions were in no way predicated on the fact that the coverage of some of them included both owners and brokers, nor was such fact even considered in those cases. More significant is the fact that the criteria applied by the courts in those cases in determining whether the classification infringed the equal-protection clause was not whether the law covered all who may be guilty of the evil, but rather whether prohibiting housing discrimination by the designated class could be deemed reasonable. The fact that thus far courts have sustained classifications based on "housing most easily financed," or upon the number and nature of the dwelling units, or upon the "investment character" of the property, does not render those classifications exclusive. Nor does it bar legislative bodies from creating others.

Translating the principles deduced from this review of the concept of equal protection to the actualities of this case, it is evident that the city council was not obliged to deal with the evil of housing discrimination in its entirety by prohibiting such conduct by all persons alike. (*Gadlin* v. *Auditor of Public Accounts,* 414 Ill. 89, 98; *People* v. *Saltis,* 328 Ill. 494, 499; *Patsone* v. *Pennsylvania,* 232 U.S. 138, 144, 58 L. Ed. 539.) Quite the contrary. Pursuant to a realistic appraisal that in this emotionally charged area of housing and race relations progress can be made by cautious advance, (*Porter* v. *City of Oberlin,* 205 N.E.2d at 370;

*New York State Com. Against Discrimination* v. *Pelham Hall Apts.,* 170 N.Y.S.2d 750,) the city could direct its attention to the aspect of the problem it deemed most acute. (*Williamson* v. *Lee Optical of Oklahoma, Inc.* 348 U.S. 483, 489; *N.J. Home Builders Ass'n* v. *Div. of Civil Rights,* 195 A.2d at 326.) This step, moreover, will not be deemed arbitrary merely because others, also guilty of the evil of housing discrimination, were not included within the classification selected. (*Levitt & Sons* v. *Div. Against Discrimination,* 158 A.2d at 187; *Patsone* v. *Pennsylvania,* 232 U.S. 138.) The *sine qua non,* however, is that under the steps taken, the differences between those included and those excluded from the law are reasonably related to its purpose. *Morey* v. *Doud,* 354 U.S. 457, at 466; *Burks* v. *Poppy Const. Co.* 370 P.2d 313, at 320.

Here the legislative body prohibited real-estate brokers from discriminating in the sale, rental or financing of housing on grounds of race, religion or national origin. In resolving whether this classification, restricting only real-estate brokers, constitutes a denial of equal protection of the law, the touchstone is "experience" rather than "abstract symmetry", (*Patsone* v. *Pennsylvania,* 232 U.S. 138,) or "theoretical inconsistency." *Railway Express Agency* v. *New York,* 336 U.S. 106, at 109.

Justification for designating real-estate brokers as a class is founded not merely on the fact that they are all engaged in the same occupation, (*Krebs* v. *Board of Trustees,* 410 Ill. 435, 441,) or that as licensees they are subject to a greater degree of regulation than those whose business does not require a license. (*City of Chicago* v. *Vokes,* 28 Ill.2d 475, 479; *Weksler* v. *Collins,* 317 Ill. 132, 139.) More basic to the statutory purpose is the fact that by the nature of their work, real-estate brokers engage in far more transactions of buying, selling, renting, and financing of property, and consequently have far more opportunity to exercise discrimination and affect the housing market than do indi-

vidual property owners. In this connection, analogy may be made to the aforementioned case of *Railway Express Agency* v. *New York*, 336 U.S. 106, at 110, where the United States Supreme Court emphasized that a classification may be reasonably made between those who engage in a harmful practice on their own behalf, and those who pursue such conduct for hire, in view of the nature and extent of their operations.

Further justification for designating real-estate brokers as the class to whom the ordinance applies appears from the evidence in the record showing the role of such brokers in establishing and perpetuating housing discrimination in Chicago on grounds of color. These discriminatory practices were not limited to the open avowals of discrimination by persons who have died, as plaintiffs suggest. On the contrary, the facts detailed at the outset of this opinion show that up until 1963, when this ordinance was adopted, real-estate brokers did not show listings in white neighborhoods to Negroes, even though there were no restrictions in the brokers' management or sales contracts with owners.

It would be a denial of experience if we were to equate the broker's role with that of an individual property owner who engages in isolated transactions, and not for hire. These "real differences" between the class included within the prohibition of the law and the class excluded are not difficult to perceive. They relate to the power and degree of exercising discrimination and of affecting the housing market, and are therefore, closely related to the purpose of the law. The action of the municipality cannot be deemed to have created an arbitrary classification.

We find neither a factual analogy, nor rules of law, compelling a different conclusion in *Morey* v. *Doud*, 354 U.S. 457, relied on by plaintiffs. The fact that the court held that an exemption of a single company engaged in the business of issuing money orders—the American Express Company—constituted an unreasonable classification, is in

no way determinative here, where the Fair Housing Ordinance applies to all real-estate brokers, and exempts no single firm, no matter how large.

Nor is *Metropolitan Trust Co.* v. *Jones,* 384 Ill. 248, determinative. There the court held unconstitutional a provision in the Small Loans Act requiring the licensees thereunder to pledge notes acquired in the course of business only with banks. That provision had the effect of excluding trust companies from trading in such notes. Since the purpose of the act was to protect the necessitous borrower, he was in no way better protected if his loan were pledged to a bank than to a trust company, since both institutions are subject to financial surveillance by the State. Hence, the classification between banks and trust companies was deemed unrelated to the statutory purpose. In contrast, here the restriction imposed upon the designated class of brokers would in fact further the legislative objective by reducing discrimination in housing.

Plaintiffs have also cited numerous other cases where classifications were held to deny equal protection of the law, and to violate the provisions of the Illinois constitution prohibiting the granting of special privileges and immunities. To sift the operative facts in each of these cases for some likeness to those in the case at bar would serve no useful purpose. The inquiry in each case is precisely the same as that made by this court, *i.e.,* whether the classification was based upon differences that were reasonably related to the purpose of the law. (*Wedesweiler* v. *Brundage,* 297 Ill. 228, 237; *People* v. *Redfield,* 366 Ill. 562, 567; *Berry* v. *City of Chicago,* 320 Ill. 536, 541; *Liggett* v. *Baldridge,* 278 U.S. 105, 73 L. Ed. 204; *Hartford Steam Boiler Inspection & Ins. Co.* v. *Harrison,* 301 U.S. 459, 81 L. Ed. 1223.) It is in the application of that principle that this court reaches a conclusion different from that urged by plaintiffs.

In resolving this issue this court is mindful that our

function in constitutional cases is confined to questions of the power of the legislative body, not the wisdom of the exercise of that power. (*People* v. *Saltis*, 328 Ill. 494, 498; *American Federation of Labor* v. *American Sash & Door Co.* 335 U.S. 538, 553, 93 L. Ed. 222.) The fourteenth amendment cannot be used to strike regulatory laws merely because they may be unwise, or out of harmony with a particular school of thought. (*Williamson* v. *Lee Optical of Oklahoma, Inc.* 348 U.S. 483, 488.) Nor should the amendment be used as a "sword against state power" when it is exercised in behalf of one of this country's cherished aims by forbidding racial and religious discrimination. *Railway Mail Ass'n* v. *Corsi*, 326 U.S. 88, 98, 89 L. Ed. 2072.

Plaintiffs argue further that this Fair Housing Ordinance violates the guarantees of freedom of speech in the Federal and State constitutions. (U.S. Const., 1st amend.; Ill. Const., art. II, sec. 4.) The ordinance declares it unlawful to solicit for sale or lease residential property on the ground of loss of value due to present or prospective entry into the neighborhood of any person or persons of any particular race, color, religion or national ancestry; it also prohibits distribution by brokers of any written matter or statements designed to induce any owner of residential property to sell or lease his property for such reason.

Freedom of speech does not comprehend the right to speak on any subject at any time. (*Kovacs* v. *Cooper*, 336 U.S. 77, 93 L. Ed. 513; *American Communications Ass'n, C.I.O.* v. *Douds*, 339 U.S. 382, 394, 398, 94 L. Ed. 925.) In the *Douds* case the United States Supreme Court specifically stated that "the right of the public to be protected from evils of conduct, even though First Amendment rights of persons or groups are thereby in some manner infringed, has received frequent and consistent recognition by this Court."

Where speech is an integral part of unlawful conduct, it

has no constitutional protection. (*Giboney* v. *Empire Storage and Ice Co.* 336 U.S. 490, 498, 93 L. Ed. 834.) More particularily, restrictions on speech against racial and religious groups have been sustained by the United States Supreme Court. (*Beauharnais* v. *Illinois,* 343 U.S. 250, 96 L. Ed. 919.) In the *Beauharnais* case the court held that an Illinois law curbing racial and religious propaganda that tended to incite breaches of the peace did not infringe freedom-of-speech guarantees. The court reasoned that in the face of the history of racial violence and accompanying extreme racial and religious propaganda, the Illinois legislature was not without reason in seeking to curb such defamatory propaganda, and that under the circumstances it was not necessary to consider the "clear and present danger" concept.

The controversial provision of the Fair Housing Ordinance, attacked as a violation of freedom of speech guarantees, was designed to strike at the practice of "panic peddling," which is condemned by all parties to this litigation. That device, whereby owners are induced to part with their property by implanting or inflaming fears that property values will diminish because Negroes are, or may become residents, not only defames a group, but is a technique used by some real-estate brokers to perpetuate segregated housing. As such, it is a handmaiden of the other discriminatory practices declared unlawful in this ordinance, and it is not entitled to constitutional protection.

Plaintiff's argument that this section is unconstitutional because it might be construed to prohibit statements of truth or praise about persons of a particular race, religion or national origin is entirely without merit. There is nothing in the terms of the law to warrant that construction, and the constitutionality of a law cannot be judged on the possibility of abuse. *Beauharnais* v. *Illinois,* 343 U.S. 250, at page 263; *N.J. Home Builders Ass'n* v. *Div. of Civil Rights,* 195 A. 2d 318, 329.

It is argued further that the provisions of the ordinance which forbid any broker to "deliberately and knowingly refuse examination of listings of any residential real estate to any person because of race, color, religion or national origin" constitute an unlawful search and seizure in violation of section 6 of article II of the Illinois constitution, and the fourth amendment of the Federal constitution.

The Fair Housing Ordinance does not authorize any exploratory investigations or "fishing expeditions," or dispossession of property as contemplated by the constitutional search and seizure prohibitions. It provides only that real-estate listings, which are ordinarily available to the public, be shown on a nondiscriminatory basis. Such listings may be refused on any ground other than race, color, religion or national origin, as designated in the law.

To the extent that any inspection is authorized by the ordinance, it is confined to showing compliance with the terms of the law. Such inspection meets the test of constitutionality enunciated in *Carden* v. *Ensminger,* 329 Ill. 612, 620, cited by plaintiffs: "An order which limits the examination [of books] to such matters as are pertinent to the issue does not infringe the constitutional guarantee against unreasonable search and seizure." The court there held, moreover, that such inspection may be at the office of the defendant and not in the presence of the court. Under these circumstances we find no unreasonable search and seizure authorized by this ordinance.

Plaintiffs contend, finally, that the Fair Housing Ordinance fails to meet the procedural requirements for due process of law in that it prescribes no standards for the conciliation hearing or for suspension and revocation of the license.

With respect to suspension or revocation of a broker's license, the ordinance provides that any such order is subject to judicial review under the Administrative Review Act. This is the same procedure followed in other types of ad-

ministrative action. Moreover, no action can be taken by the mayor, except on recommendation of the Human Relations Commission after a full hearing pursuant to notice to the parties, and followed by report and recommendations, which must be served on the parties. Such provisions are ordinarily significant indicia of procedural due process of law.

The conciliatory procedure in the ordinance is a preliminary feature designed to implement voluntary compliance without the stigma of punitive action. (74 Harvard Law Review 526.) It is permissive in character and is in no way binding on the parties who are entitled under the ordinance to a full formal hearing in addition. This conciliation machinery is similar to that provided in the overwhelming majority of municipal and State laws dealing with prohibitions against discrimination by private persons; it is included in fair housing laws, in fair employment laws, and in public accommodations laws. (64 Michigan Law Review 710, 713.) None of these laws provide any standards for the conciliation process; nevertheless they have been deemed constitutional. *Heart of Atlanta Motel* v. *United States,* 379 U.S. 241, 13 L. Ed. 2d 258; *Marshall* v. *Kansas City,* (Mo., 1962) 355 S.W. 877; *Motorola, Inc.* v. *Illinois Fair Employment Practices Com.* 34 Ill.2d 266, 269; *Holland* v. *Edwards,* 307 N.Y. 38, 119 N.E.2d 581.

In *Porter* v. *City of Oberlin,* 1 Ohio St. 2d 143, 250 N.E.2d 363, where the enforcement machinery, but not the act itself, was held unconstitutional, the act was unique in that it allowed the city council complete discretion as to whether a criminal prosecution should be brought. No such power is conferred on the mayor under this ordinance.

In our judgment, since the ordinance provides for all the safeguards necessary for a fair administrative adjudication, the availability of the permissive preliminary conciliation procedure in no way impairs those safeguards or constitutes a denial of procedural due process of law.

From the foregoing analysis we conclude that the city of

Chicago had authority, under its expressly delegated power to regulate real-estate brokers, and the police power incidental thereto, to enact the Fair Housing Ordinance, which prohibited real-estate brokers from discrimination on grounds of race, color, religion or national origins in the sale, rental, or financing of housing. The ordinance was enacted in an effort to cope with the plethora of problems resulting from discrimination in housing. The imposition of the restrictions on real-estate brokers alone was reasonably related to the objectives of the law and was not arbitrary, in view of the fact that they affect the housing market to a far greater extent than do individual property owners. Consequently, this ordinance in no way infringed the constitutional guarantees of due process or equal protection of the law. Nor does it offend any other constitutional provision.

Therefore, the decree of the circuit court declaring the Chicago Fair Housing Ordinance valid, and denying the injunction against its enforcement, is affirmed. Since the plaintiff Real Estate Board has not argued the dismissal of the complaint as to it on the ground that it was not a broker aggrieved by the ordinance, that issue is deemed waived.

*Decree affirmed.*