THE VILLAGE OF GOODFIELD, Plaintiff-Appellant, v. JAN JAMISON,
Defendant-Appellee.

Fourth District   No. 4—88—0915

Opinion filed September 28, 1989.

Frederick G. Hoffman, Craig W. Stensland, and Frank M. Calvert, all of Thomas & Hinshaw, Culbertson, of Peoria, for appellant.

John Naylor, of Naylor, Mueller & Willard, P.C., of Bloomington, for appellee.

JUSTICE LUND delivered the opinion of the court:

On July 22, 1988, the Village of Goodfield, plaintiff, filed a complaint in the circuit court of Woodford County, seeking to permanently enjoin defendant Jan Jamison from operating a business located within one mile of plaintiff's corporate limits. On December 12, the court held plaintiff had failed to establish, by its burden of proof, that the proposed facility is offensive or unwholesome, or would create either a statutory or common law nuisance. Plaintiff now appeals.

Defendant intended to build a hog transfer station on Route 117, approximately one-half mile north and east of the corporate limits of plaintiff. The purpose of the transfer station was to allow local hog producers to bring their hogs to the station. That same day, when

enough hogs to transport have been collected, defendant will have them taken to the market.

As grounds for its injunction, plaintiff alleged that the hog transfer station would result in a repugnant odor, decrease plaintiff's property values, limit commercial and residential growth in the area, correspondingly lowering business and tax revenues, increase truck traffic, increase noise, and lower the quality of life in the village, which would all work to create irreparable harm to plaintiff's residents. On October 14, 1988, a hearing was conducted. The court earlier determined the burden would be on plaintiff to prove defendant's business was a prospective nuisance.

Defendant was called as an adverse witness. He works as a livestock broker and dealer, with his offices being located in the Stockyard Exchange Building in Peoria. He designed the plans for the facility himself. It is designed to handle a capacity of about 600 hogs per day. Local producers will bring the hogs in on small trucks, and the hogs will be leaving on larger trucks. He explained the purpose of the station was to accumulate and disburse hogs as rapidly as possible. Once they receive a semitrailer load, which is around 180 to 220 head, a truck will be called, and they will be transferred. He plans to operate five days per week, with a very limited operation on Saturdays. The hours would be approximately 6 a.m. to 8 p.m.

He explained the facility, as planned, is 176 feet by 66 feet. It will have a concrete impermeable pit located underneath it measuring 127 feet by 6 feet by 5 feet. The pit will have a concrete cap with a four-inch mouth. Each day, the waste will be washed down into the pit. He believes this will require 200 to 600 gallons of water. He does not intend to wash the pigs down while they are on the property or once they are on the trucks. He believes he will only have to clean the pit twice per year. However, he would drain it more often, if necessary. He thinks, since the pit will be mainly water, the only agitation necessary will be accomplished by the pumping of the pit. He has two local customers who have asked about purchasing the pumped-out fluid for fertilizer. The building's only ventilators will be located in the roof to allow the escape of heat. The design of the building would allow for the loading and unloading of hogs on a concrete ramp which comes directly to the building. The design also keeps any waste materials from escaping the building during loading.

It is possible that sometimes he may have to keep 20 to 30 pigs overnight. He will have a very limited amount of feed for those times. It is also possible a pig may die, in which case he would call a rendering company. However, in Peoria last year, they dealt with over

28,000 pigs and not one died.

This building is based on his ideas from 25 years of experience in the field. He read the materials the Environmental Protection Agency (EPA) sent him. A facility of this type has not been built in Illinois. It is his opinion, based on his experience, that there would be no odor to the village.

Originally, he sought to build his business in northern Woodford County, but the zoning board would not change the zoning of the proposed sight. After he found the present location, he received a permit from the county zoning administrator. At this point, all construction has ceased pending resolution of this lawsuit.

Dr. Richard Vetter testified next. He is currently the director of research and development with A.O. Smith-Harvestore Products concerning animal production, feeding, and waste handling and storage. He was a professor at Iowa State for 16 years. He has visited hundreds of swine production facilities during his career.

He stated that pig waste is a higher odor-producing waste than that of other livestock. His experience is that swine facilities have an odor, and he has been at some that can be smelled more than one-half mile away. They also have, based upon the management of the facility, insects and rodents. He has reviewed the plans for the facility. He calculated the pit could hold 28,500 gallons. Based on an assumption of using 300 gallons of water per day, the pit would have to be drained three or four times per year. He also believes the pit, as designed, will be difficult to agitate. Without proper agitation, the solids will remain on the bottom. Also, the time of agitating is when the odor is the worst. A pit of this type can leak but, with proper construction, the probability of this can be kept low.

He explained it is desirous to set a facility up as far as feasible from a community because odors can travel some distance. However, the distance they can travel is very conditional upon the wind direction, humidity, time of year, and temperature. The American Society of Agricultural Engineers (ASAE) suggests a minimum distance of one mile. Assuming that there are westerly prevailing winds, which travel from southwest to northeast, the probability is the smell would be greater in the area to the east. It would also be stronger during the summer.

On cross-examination, he explained his main concern for odor was during the time of agitation. If the wind was blowing away from plaintiff, it would receive no odor. He also acknowledged most of his experience is with hog production facilities. These have more feed and waste present, which leads to more problems with mice and flies. This

problem can be kept to a minimum with good husbandry techniques.

The next witness was Eric Ackerman, who has been employed by the Illinois EPA for 10 years. He is also a licensed professional engineer. His areas of responsibilities are livestock waste management and agricultural chemical outlets.

Most complaints he receives concerning swine facilities are about odor. He has visited in excess of 300 facilities, and some have been similar in design to defendant's. In each facility, there was an odor and also noise. It is his opinion that during on and off loading, the residents of plaintiff could hear the pigs. The EPA has regulations concerning this type of facility, which provide that no livestock operation should be in close proximity with populated areas. He relies on the guidelines of the ASAE which suggest a one-mile minimum. The EPA also has regulations which require the waste pit be able to hold 120 days of waste. His calculations show the proposed pit has a storage capacity of 70 to 75 days.

There is also a risk involving the pit storage method because the waste, as it breaks down, will form ammonia, methane, and hydrogen sulfide. When the pit is agitated, these gases are released and can create a dangerous situation. Some farmers have been killed by the gases being released from the pit. He cannot tell if this pit will leak. He has been around some that have. In his experience, the odor from swine facilities can travel in excess of one mile, and there are problems with rodents and flies. His main concern with odor in this case is based on the liquid storage of waste. Facilities with dry storage, by using straw and bedding, have less odor. It is his opinion that the designs for the facility violate EPA rules by being too close to town and not having 120 days' waste storage. He did explain on cross-examination that defendant does not need a permit to construct or operate the facility.

Plaintiff's evidence also established that the business is one-half mile north of plaintiff and approximately six-tenths of a mile northwest of Timberline Campgrounds and the Conklin Players Dinner Theater. Approximately 1,000 people per year use the campground facilities. The theater has a dinner theater which runs 50 weeks per year, a children's theater which operates outdoors 8 to 10 weeks during the summer, and a bed and breakfast operation. Also, the logical place for plaintiff's expansion, due to the fact Interstate 74 is on the south, would be to the north in defendant's direction. On July 21, 1988, the village board passed a resolution opposing the facility because it was a nuisance.

A local hog producer who would use the facility stated, in his

opinion, the noise and odor would carry to plaintiff. Several local property owners, including those of the campground and the dinner theater, testified concerning their concern over noise and odor.

Finally, a licensed real estate appraiser testified that in his experience, the presence of odors lowers property values 5% to 25%. It was his opinion that the loss of value to plaintiff's property, due to defendant's business, would be 5% to 12%.

Gerald Morey, defendant's first witness, is a hog buyer for a company in Michigan and has been employed in this field for 15 years. He has visited over 50 hog transfer stations, and 85% to 90% of these are located either in or within one-half mile of a town. After reviewing the plans, he believed defendant's facility was above average from a standpoint of odor and sanitation. It is his opinion the odor would not reach plaintiff.

William Dwine was a hog buyer prior to his retirement. He has visited over 200 hog transfer stations over his career. Of these, 80% to 85% are either in or adjoining a town. It is his opinion, after viewing the blueprints and the site, that no odors would travel to plaintiff.

Ray Crammond is a civil and agricultural engineer registered in Iowa, Illinois, and Florida. A majority of his work is in determining suitable locations for waste facilities. It is his opinion defendant's site is an appropriate location for such a facility because it is on a paved road, which keeps dust to a minimum; it has electricity available; and it has its own well. It is his experience that 80% to 85% of hog transfer stations are in or within one-half mile of towns, and that they coexist with residential buildings nearby.

In reaching his opinions, he relied on traffic flow information from the Illinois Department of Transportation, which showed 12,500 vehicles per day went through an intersection in plaintiff, and 3,800 per day passed the site of the proposed facility. Accordingly, he does not believe there will be an increased traffic problem since there will be, at most, two to three semi-trucks and 20 to 30 smaller trucks. Also, records from the Illinois State Climatologist reveal the prevailing winds for 10 months are from the south. Only in February and March is it from the west and northwest. It's his opinion there will be no odor problem. It is also his opinion this facility will not be a nuisance. He is aware of the standards of the ASAE and, in fact, serves on one of its boards. He believes this standard is meant to apply to a livestock producing facility and is inapplicable to the current situation. He did acknowledge that animal waste may fall off the transporting vehicles.

Robert Weers is the zoning administrator of Woodford County. He

testified that in 1974, the parcel in which the property in question is located had its zoning changed from agricultural to commercial. At the time, hearings were held in the village concerning this change. There was never any restriction requested on the use of the land. Kenneth Coulter, owner of a farm adjacent to defendant, stated he has no objection to the transfer station. Finally, defendant testified he is willing to alter his plans to meet the earlier stated objections.

The court determined plaintiff failed to meet its burden of proof. Plaintiff appeals, alleging (1) the court improperly placed the burden on it rather than defendant; and (2) even if the burden was properly placed, the court's decision was against the manifest weight of the evidence. We affirm.

■ Initially, plaintiff maintains the court erred in placing the burden of proof on it. It believes a presumption exists that a municipality's determination that certain conduct is a nuisance is valid, and the burden is properly placed on the other party to show this determination is incorrect.

Section 11—60—2 of the Illinois Municipal Code (Code) provides:

> "The corporate authorities of each municipality may define, prevent, and abate nuisances." (Ill. Rev. Stat. 1987, ch. 24, par. 11—60—2.)

As early as 1883, it was recognized that, while a municipality could not pass an ordinance declaring something a nuisance when it is clearly not so:

> "[I]n doubtful cases, where a thing may or may not be a nuisance, depending upon a variety of circumstances requiring judgment and discretion on the part of the town authorities in exercising their legislative functions, under a general delegation of power like the one we are considering, their action, under such circumstances, would be conclusive of the question." (*North Chicago City Ry. Co. v. Town of Lake View* (1882), 105 Ill. 207, 212.)

More recent cases involving section 11—60—2 of the Code have relied on this holding in concluding that a municipality has authority to regulate, as a nuisance, anything in which there could be an honest difference of opinion and, in questionable cases, the municipality's decision will be conclusive unless its judgment and use of discretion are clearly erroneous. (*Village of Caseyville v. Cunningham* (1985), 137 Ill. App. 3d 186, 189-90, 484 N.E.2d 499, 501; *Village of Riverwoods v. Untermyer* (1977), 54 Ill. App. 3d 816, 822, 369 N.E.2d 1385, 1390.) Further, section 11—60—2 gives municipalities the authority to prevent nuisances and, therefore, its police powers are not limited to

those things which have already become nuisances, but extend to those things which may become a nuisance. *Village of Carpentersville v. Fiala* (1981), 98 Ill. App. 3d 1005, 1008, 425 N.E.2d 33, 36.

Thus, it is evident if defendant had selected a site within plaintiff's corporate limits for the proposed business, then, pursuant to section 11—60—2, plaintiff could have properly declared defendant's business a nuisance, and the burden of proof would have been on defendant. The question before us now is whether the provisions of the section can be applied to a business located one-half mile outside the municipality's limits. Plaintiff argues the extraterritorial authority is provided by section 11—42—9 of the Code, which provides:

> "The corporate authorities of each municipality may prohibit any offensive or unwholesome business or establishment within the municipality and within the distance of one mile beyond the municipal limits." (Ill. Rev. Stat. 1987, ch. 24, par. 11—42—9.)

It believes the provisions should be read together, and that the "offensive or unwholesome business" referred to in section 11—42—9 is analogous to the nuisance provisions of section 11—60—2. Accordingly, it believes the presumption in favor of legislative determinations contained in section 11—60—2 should be applicable to within the distance of one mile beyond the municipal limits.

■■ ■ The cardinal rule in statutory construction is to ascertain and give effect to the intent of the legislature. (*People v. Boykin* (1983), 94 Ill. 2d 138, 141, 445 N.E.2d 1174, 1175.) In determining the legislative intent, courts should first consider the statutory language. (*Boykin*, 94 Ill. 2d at 141, 445 N.E.2d at 1175.) If that language is clear, it will be given effect without resort to other aids of construction. (*People v. Robinson* (1982), 89 Ill. 2d 469, 475-76, 433 N.E.2d 674, 677.) Cities, as creatures of the legislature, have no inherent powers and must rely on those expressly granted from the legislature. (*Chicago Real Estate Board v. City of Chicago* (1967), 36 Ill. 2d 530, 537, 224 N.E.2d 793, 799; *Barnard & Miller v. City of Chicago* (1925), 316 Ill. 519, 522, 147 N.E. 384, 385.) Accordingly, statutes granting powers to municipal corporations are strictly construed, and any fair and reasonable doubt as to the power must be resolved against the municipality. *Barnard*, 316 Ill. at 522, 147 N.E. at 385.

■ In applying these principles, we conclude that section 11—60—2 has no such extraterritorial impact. First, as noted, a municipality's powers are to be strictly construed to those specifically given it. Here, the language of section 11—60—2 contains no specific extraterritorial authority. Second, the legislative intent as to the scope of this authority to declare a nuisance is further clarified in section 221 of

"An Act to revise the law in relation to criminal jurisprudence" (Ill. Rev. Stat. 1987, ch. 100½, par. 26), which reads, in relevant part:

"Nothing in this Section shall be construed to prevent the corporate authorities of any city, village, or incorporated town, or the county board of any county, from declaring what shall be nuisances, and abating them within their limits."

Since this section clearly evidences a legislative intent to limit a municipality's authority to declare a nuisance to its corporate limits, and section 11—60—2 does not contain any specific language to the contrary, it is apparent the asserted extraterritorial power does not exist.

Section 11—42—9 does not call for a contrary result. Since this section and section 11—60—2 were passed by the legislature at the same time, it is evident they were passed to perform separate functions and were not intended to be read together. In fact, section 11—42—9, since it does authorize the municipality to proceed outside its corporate limits, cuts against plaintiff's position. It establishes that the legislature clearly knew how to grant this authority and the fact it was not granted in section 11—60—2 leads to the conclusion the legislature did not intend for it to be there.

■ Therefore, we hold that a municipality's authority, pursuant to section 11—60—2, to declare a nuisance, with the resulting burden of proof being placed upon the other party to establish this decision is clearly erroneous, ends at the municipality's corporate limits. If a municipality wishes to proceed to abate an alleged nuisance outside those corporate limits, the burden of proof, as would normally be the case, is properly placed upon it.

Plaintiff next contends that the court's determination in this case that defendant's proposed business is not offensive or unwholesome, or a nuisance, is against the manifest weight of the evidence.

■ A party has a high burden in seeking a prospective injunction. Our supreme court in *Village of Wilsonville v. SCA Services, Inc.* (1981), 86 Ill. 2d 1, 26, 426 N.E.2d 824, 836, announced the standard by adopting the following language of *Fink v. Board of Trustees* (1966), 71 Ill. App. 2d 276, 281-82, 218 N.E.2d 240, 244:

"While, as a general proposition, an injunction will be granted only to restrain an actual, existing nuisance, a court of equity may enjoin a threatened or anticipated nuisance, where it clearly appears that a nuisance will necessarily result from the contemplated act or thing which it is sought to enjoin. This is particularly true where the proof shows that the apprehension of material injury is well grounded upon a state of facts from which it appears that the danger is real and immediate. While

care should be used in granting injunctions to avoid prospective injuries, there is no requirement that the court must wait until the injury occurs before granting relief."

Thus, plaintiff's burden is that it must clearly appear that there is a danger of a real and immediate injury occurring. Findings of fact made by courts in this regard will not be set aside unless they are contrary to the manifest weight of the evidence. *Wilsonville*, 86 Ill. 2d at 15, 426 N.E.2d at 831; *John J. Calnan Co. v. Talsma Builders, Inc.* (1977), 67 Ill. 2d 213, 218, 367 N.E.2d 695, 698.

In the present case, plaintiff's main concern seemed to be over the presence of odor and flies, which can be sufficiently bothersome to be subject to injunctive relief. (See, *e.g.*, *Woods v. Khan* (1981), 95 Ill. App. 3d 1087, 420 N.E.2d 1028.) Plaintiff's experts testified the odor would reach the village especially in the summer when the winds blow in its direction. In fact, Vetter assumed the prevailing wind would blow toward plaintiff. However, defendant presented testimony of two people familiar with many similar facilities, and both maintained no odor would reach the town. He also had testimony of his expert that the odor would not reach town and, in fact, that the prevailing wind for 10 months per year was in another direction. Even if plaintiff's testimony is accepted, it was its expert's opinion that the odor would only be bothersome the three or four times a year it was necessary to clean the tank.

In its complaint, plaintiff also complained about increased traffic, noise, flies, and pests. Plaintiff presented no evidence on traffic. On the other hand, defendant established 3,800 vehicles per day passed the proposed site, and 12,500 passed the busiest intersection in town. The increase in vehicles would be, at most, 3 semitrailer trucks and 20 to 30 farm trucks. This does not seem to be a large increase.

Concerning noise, plaintiff's experts testified the animals could be heard during loading and unloading. Defendant presented evidence to the contrary. All the testimony concerning the flies and rodents was that proper husbandry would limit any problems.

Concerning the location, plaintiff points out that the local EPA agent believes the location is too close to town. Both its experts testified the ASAE guidelines suggest at least one mile separate the facility from the town. However, this was also contested by defendant's expert, who maintained these guidelines are for hog producers and not hog transfer stations.

Plaintiff also argues the evidence supports a finding that the location will have an adverse impact on its people and businesses. However, the testimony as to the negative impact on Timberline

Campgrounds and the Conklin Players Dinner Theater is highly speculative and based on the belief of the presence of the offending odor. Yet, the likelihood of the presence of any odor is highly contested.

It is uncontested that the hog-transporting trucks may smell as they pass through town and may lose some waste material on the road. Also, it is uncontradicted that property values will decrease, but the fact property values decrease alone will not entitle the landowners to injunctive relief. *Bauman v. Piser Undertakers Co.* (1962), 34 Ill. App. 2d 145, 150, 180 N.E.2d 705, 708-09.

■■ In *Wilsonville*, the supreme court, in discussing the likelihood of harm that is necessary to support the granting of a prospective injunction, stated:

" '[O]ne distinguishing feature of equitable relief is that it may be granted upon the threat of harm which has not yet occurred. The defendant may be restrained from entering upon an activity where it is highly probable that it will lead to a nuisance, although if the possibility is merely uncertain or contingent he may be left to his remedy after the nuisance has occurred.' " *Wilsonville*, 86 Ill. 2d at 26, 426 N.E.2d at 836, quoting W. Prosser, Torts §90, at 603 (4th ed. 1971).

■■ In the present case, the trial court's determination was not against the manifest weight of the evidence. Accordingly, plaintiff's request for an injunction was properly denied. If defendant persists in building his facility, and plaintiff's worst fears come true, it can seek an appropriate remedy at that time.

Affirmed.

SPITZ and GREEN, JJ., concur.