This is an appeal from a judgment of the circuit court of Pope county confirming an order of the Illinois Commerce Commission. The appeal was perfected by the Illinois Central Railroad Company under section 69 of the Public Utilities Act. Ill. Rev. Stat. 1945, chap. 111 2/3, par. 73.
The proceeding originated with the filing of a petition by the railroad company with the commission asking for the abandonment of a highway bridge over its railroad at the village of Robbs, in Pope county. In the alternative, the petition asked that if the commission required the reconstruction or repair of the bridge, the expense thereof be ordered paid by the highway authorities having jurisdiction of the highway served by the bridge. After a hearing the commission denied the petition for the abandonment of the bridge. It ordered that the bridge be reconstructed at *Page 305 
the expense of the railroad company. An appeal to the circuit court of Pope county followed. The circuit court confirmed the order of the commission.
At the point where the bridge in question is located, the railroad extends northeasterly and southwesterly. At that point the highway crosses the railroad at a right angle. East of the railroad the highway extends in an easterly direction to the village of Glendale, which is approximately a mile and three quarters east of the village of Robbs. West of the railroad the highway extends in a northwesterly direction. The bridge spans the railroad as a part of this county highway, which is designated as State Aid Route 6-A. The unincorporated village or community of Robbs is located immediately west of the railroad. It is a one-street village, extending from the railroad west along Route 6-A. Route 163, which is a Federal Aid improved highway, crosses the railroad 1100 feet north of the bridge sought to be abandoned. Route 163 runs practically east and west, bearing to the north, east of the railroad, and to the south, west of the railroad. The two routes intersect at a point approximately 1600 feet west of the railroad. The triangle formed by the railroad, Route 163 and Route 6-A, extends along the railroad approximately 1100 feet, along Route 163 approximately 1800 feet, and along Route 6-A, approximately 1600 feet. Most of the residences and business buildings in the village of Robbs are located on the north side of Route 6-A, and extend from the railroad westerly practically to the intersection of that route with Route 163. The buildings on the south side of Route 6-A extend westerly from the railroad slightly more than half way to the intersection of the two routes. The business section consists of a general store, a restaurant, a sawmill, a blacksmith shop and a lumber yard, all of which are owned by the witness Robbs. In addition to the business buildings there are about thirty-five residences. The commission found the population to *Page 306 
be 150. About half of the dwellings are located near the intersection of the two highways. From a point on Route 6-A, near the center of the village and the center of the south side of the triangle in which it is located, there is also a road known as the Mill road. It extends practically due north from Route 6-A to Route 163. The Mill road intersects Route 163 at a point 1368 feet west of the railroad. This road belongs to the witness Robbs. He testified that it had been used as a road for twenty-five or twenty-six years and that anyone may use it who desires to do so. There is also a rock road extending along and parallel with the west side of the railroad. This road extends from Route 163 south across Route 6-A, to the property of the experiment station operated by the University of Illinois. Another road extends from Route 163 south along and paralleling the east side of the railroad to a point some distance south of Route 6-A. It then continues in a southeasterly direction. This is a gravel road. It was improved and is maintained by the University of Illinois. It is maintained in good condition. It is used by the employees and others connected with the experiment station and by the public generally. Whether it has been established as a public highway, the record does not definitely disclose.
The bridge in question is a wood structure, constructed by the railroad company in 1925. Since that time it has been maintained by the railroad company. Up until 1941, it was the only overhead crossing over the railroad in that vicinity. In 1941, however, Route 163 was improved and a concrete overhead crossing was constructed over the railroad as a part of that route. As already observed, this crossing is 1100 feet north of the bridge on Route 6-A. If the bridge here involved is abandoned, it will be necessary for those coming from points east of the railroad and east or southeast of the point where the bridge is located, in order to reach the village of Robbs, to travel on the *Page 307 
east side of the railroad north a distance of 1100 feet in order to cross the railroad on Route 163. They would then be required to travel westerly on Route 163, to the point where it intersects with the Mill road, then south to the village. This would be a total distance of approximately 2750 feet of additional travel over what is required by using the present bridge. By traveling a slightly longer distance after crossing the railroad on Route 163, they could go west on said route to its intersection with Route 6-A, thence southeast on Route 6-A to the village. After crossing the railroad on Route 163, they could also go south on the rock road paralleling the west side of the railroad to the village. The additional distance traveled by this route would be 2200 feet. The evidence shows, however, that this road on the west side of the railroad is not at all times passable. Thus, in order to enable those coming from points east and south of the bridge to reach the village, the total additional travel would be from 2200 feet to 2750 feet, depending on which route is traveled.
The University of Illinois owns about 5000 acres of land in the vicinity which it operates as an experimental farm. It has thirteen regular permanent employees. In addition it employs sixteen to eighteen men on a temporary basis. Some of its lands on the east side of the railroad are north of Route 163. Some of the lands on the east side extend a considerable distance south of the bridge in question. On the west side of the railroad its lands extend practically from Route 6-A on the north, south and southwest for a great distance. On these grounds the university maintains approximately 500 head of cattle and 1000 breeding sheep. It purchases, each year, about 2000 turkey poults which are grown to maturity and disposed of in the fall. Approximately 800 acres are farmed. The warehouses and shops of the experiment station are located on the east side of the railroad, north of Route 163. The beef-cattle headquarters are located west of the railroad and some *Page 308 
distance south of Route 6-A. The cattle are wintered on the west side. Some of the experiment station's dwelling houses, occupied by employees, are also located on the west side of the railroad between the beef-cattle headquarters and Route 6-A. Some of them are on the east side of the railroad, approximately 100 feet south of Route 163. These are located along the rock road paralleling the east side of the railroad and extending south from Route 163 to points south of the bridge. The sheep and turkeys are kept on the east side of the railroad. Buildings for them are maintained on the east side, a short distance southeast of the bridge in question. During the grazing season, the cattle are pastured on various parts of the lands located both east and west of the railroad. They are frequently transferred from one side to the other during that season. The railroad also maintains, for the use of the experiment station, a farm crossing with gates connecting its lands on the east and west sides of the railroad. It is located about three eighths of a mile south of the cattle barns on the west side of the railroad. This crossing has been used safely as a cattle crossing by the experiment station for a number of years. The experiment station stores feed for the cattle on the west side of the railroad, and feed for the sheep and turkeys on the east side. It has no occasion to transfer feed from the west side to the east side, except in cases of emergency shortages.
The testimony shows that there are from eight to, possibly, fifteen families residing east of the railroad within a radius of a mile or mile and a half of the bridge sought to be abandoned. Those living beyond a radius of five eighths of a mile east of the bridge are nearer the village of Glendale than the village of Robbs. If the bridge is abandoned, in order to reach the village, those living south and east of the present bridge will be compelled to travel an additional 1100 feet north to Route 163, and a like distance back on the west side of the railroad. This *Page 309 
additional travel will be somewhat greater if they use Route 163 and the Mill road, or Route 6-A, instead of the rock road paralleling the railroad on the west side. Using the longest available route, at most, the additional travel would be slightly more than 2750 feet.
The record shows that on November 8 and November 11, 1944, traffic over the bridge was checked. November 8 was on Wednesday. The total units, including pedestrians, which crossed the bridge on that day from 6 o'clock in the morning until 10 o'clock at night, was one hundred forty-eight. November 11 was on Saturday. The witness Robbs, who owned all the business in the village, testified that "Saturday is our big market day." On that day a check was taken during the same hours. The total units crossing the bridge was one hundred fifteen. On November 8 the experiment station was moving cattle across the railroad. On that day when the traffic census was taken, the units included a number of trucks operated in connection with the experiment farm, moving cattle from one side of the railroad to the other. Also a number of vehicles belonging to the State or experiment farm crossed the bridge back and forth several times during the day.
At the suggestion of the examiner, a directional traffic census was taken on June 1, 1945, between the hours of 7 A.M. and 7 P.M. On that date one hundred and two units passed over the bridge, including two pedestrians, one man on horseback, and one farm tractor. Of the one hundred and two units crossing the bridge on that date, eighteen cars, twenty-one trucks, and one pedestrian came from the direction of Route 163 over the gravel road paralleling the east side of the railroad and turned west across the bridge. Fifteen automobiles, twenty trucks and one tractor came from the west and crossed the bridge, then turned north and traveled over the same gravel road along the east side of the railroad north toward Route 163. Approaching the bridge from the south over the gravel road along the east *Page 310 
side of the railroad, south of Route 6-A, there were three cars and two trucks which crossed the bridge going west. From the west, three trucks crossed the bridge and turned south on this same gravel road. From the east on Route 6-A, two automobiles, three trucks, a man on horseback, and one pedestrian approached the bridge and crossed over to the west.
This traffic census, therefore, shows that of the total of one hundred and two units passing over the bridge on June 1, 1945, forty reached the bridge by coming down the gravel road on the east side of the railroad from Route 163, turning west over the bridge. Thirty-six other units came from the west, crossed over the bridge, and then traveled northward over the gravel road along the east side of the railroad toward Route 163. There were only twenty-six units crossing the bridge which did not reach the bridge by traveling south from Route 163 over the gravel road on the east side of the railroad, or which did not enter that gravel road after they had crossed the bridge from the west and then proceed north in the direction of Route 163. Of the eleven units approaching the bridge from points east and south of the bridge and crossing over the bridge to the west, five came from the south over the gravel road extending along the east side of the railroad, south of Route 6-A, and six came from the east traveling over Route 6-A. Three units crossed the bridge coming from the west on Route 6-A and turned south on the gravel road after they had crossed the bridge.
The evidence shows that the traffic over the bridge, except for the use of the experiment station, is practically negligible. The traffic census of June 1, 1945, must be taken as indicative of the extent of the public use. If it was not a fair indication of the amount of traffic, it must be assumed that other traffic counts would have been taken and offered in evidence by respondent or others interested in having the bridge maintained. The June 1 census shows *Page 311 
that a total of fourteen units used the bridge going to or coming from points east and south of the bridge. Of the other units, forty came from Route 163, and thirty-six, after they had crossed the bridge from the west, turned north on the gravel road east of the railroad and proceeded north in the direction of Route 163. The forty units which came from the north on the gravel road extending south from Route 163 to the bridge could as conveniently have crossed the railroad on Route 163 and proceeded south on the west side of the railroad. Likewise the thirty-six units which came from the west and then proceeded north on the gravel road leading back to Route 163, could have as conveniently gone north on the west side of the railroad and crossed on Route 163.
It is obvious that practically all of the traffic using the bridge was vehicles used in connection with the experiment station. The supposed inconvenience even to that traffic is unsubstantial. The travel from the shops and warehouses of the experiment station, located on the east side of the railroad and north of Route 163, to and from any point on the west side of the railroad, by the use of the crossing on Route 163, would be practically the same distance as over the bridge on Route 6-A. Such traffic would not be inconvenienced by the abandonment of the bridge. The same is true of the traffic to and from the experiment station houses located on the east side of the railroad and at a point a short distance south of Route 163 to points west of the railroad. As to traffic to and from that portion of the farm located on the west side of the railroad to parts of the farm east and south of the present bridge, the use of the farm crossing, three eighths of a mile south of the cattle barns, is both available and convenient, in fact, more so than the bridge. Traffic from points south and east of the bridge to the village not using the farm crossing would be compelled to travel an additional 1100 feet north from the bridge, cross over the railroad on Route 163, and *Page 312 
then travel substantially the same distance back to the village on the west side. The witness Robbs, who owned every business in the village, while he expressed the opinion that the abandonment of the bridge would inconvenience some, testified that he was "not sufficiently interested in the bridge to participate in the expense of its reconstruction or its future maintenance." The chairman of the board of county commissioners and the county superintendent of highways testified that the county was not in a financial position to reconstruct the bridge. It would, of course, be a convenience to some to have the bridge maintained. It would be a convenience to every farmer to have an overhead crossing at every point near his farm where he might occasionally desire to cross. It would likewise be a convenience to everyone living in the village or desiring to go there to have an overhead crossing at every point most convenient for him to cross. But the public convenience, to warrant the necessity of having a little-used facility continued, is not determined by those factors.
The record does not show that the railroad maintains a depot or other facility for the receipt and discharge of passengers or freight at the village of Robbs. The witness Robbs testified that he had not shipped or received any freight which was shipped over the railroad in the last year. Consequently, it does not appear that those using the bridge did so in connection with the business of the railroad. In this respect it derives no advantage or benefit from the maintenance of the bridge.
Upon the foregoing undisputed facts, the commission found that the public convenience and necessity required the rebuilding and continued maintenance of the bridge. It ordered the reconstruction of the bridge at an estimated cost of $6000 by the railroad company within six months from the date of the service of the order.
In reviewing an order of the commission, this court is limited to a determination of whether the commission *Page 313 
acted within the scope of its authority, whether the order has substantial foundation in the evidence, and whether any substantial right has been infringed by the order. (AltonRailroad Co. v. Commerce Com. 382 Ill. 478.) The provisions of the statute authorizing a review of the orders and findings of the commission were not intended to be a mere process by which the findings are to be approved without regard to what is disclosed by the substantial evidence in the case. The findings of the commission are only prima facie evidence that its orders are reasonable. We are not bound to believe that facts in evidence establish a given conclusion if the conclusion is not reasonable. (Lowden v. Commerce Com. 376 Ill. 225.) It is also true that orders of the commission are entitled to great weight. They can be set aside only when it is clearly apparent that such orders are arbitrary or unreasonable or directly contrary to some established rule of law. Illinois Central Railroad Co. v.Franklin County, 387 Ill. 301.
The convenience and necessity required to support an order of the commission are those of the public and not of the individual or a number of individuals. (O'Keefe v. Chicago Railways Co.354 Ill. 645; West Suburban Transportation Co. v. Chicago and WestTowns Railway Co. 309 Ill. 87; Public Utilities Com. v. Toledo,St. Louis and Western Railroad Co. 286 Ill. 582.) Where it is found that the order of the commission is without substantial foundation in the evidence, it is the duty of the courts to set it aside. (Choate v. Commerce Com. 309 Ill. 248.) It is the duty of the court to weigh and consider the evidence and if it is found that the order of the commission is without substantial foundation in the evidence it should be set aside. Commerce Com.ex rel. City of Bloomington v. Cleveland, Cincinnati, Chicago andSt. Louis Railway Co. 309 Ill. 165. *Page 314 
From a consideration of the facts established by the undisputed evidence, which we have already fully set forth, no substantial evidence can be found in this record which would justify the conclusion reached by the commission, or support its order for the reconstruction of the bridge at the expense of the railroad company. The reconstruction and maintenance of the facility in question is practically for the sole convenience of the experiment farm, operated by the University of Illinois. The convenience of other members of the public is purely negligible. The order of the commission is unreasonable and unjustified by any substantial evidence in the record. The slight inconvenience which the public will experience as a result of the abandonment of the bridge does not justify the finding that the public convenience and necessity requires the reconstruction and maintenance of the bridge. If the commission was of the opinion that the bridge should be maintained for the negligible convenience of the experiment station and the others whose convenience would be slightly interrupted by abandonment of the bridge, it should have ordered the reconstruction and maintenance of the bridge at public expense. The order of the commission has no substantial foundation or basis in the evidence, and is arbitrary, unreasonable and unlawful.
The judgment of the circuit court of Pope county is reversed. The cause is remanded to that court with directions to enter an order setting aside the order of the commission in its entirety.
Reversed and remanded, with directions.