Mirko Gasparas, Plaintiff-Appellee, v. Wallace Leack, et al., Being and Constituting the Board of Fire & Police Commissioners of the Village of Justice, Cook County, Illinois, and Edward Naydeck, Defendants-Appellants.

Gen. No. 52,326.

First District, Second Division.

March 12, 1968.

Sodaro, Wisner & Beaver, of Chicago (Dean J. Sodaro, of counsel), for appellants.

Walter C. Wellman, of Lyons, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

After a hearing before the Village Board of Fire and Police Commissioners, plaintiff Captain Mirko Gasparas was found guilty of conduct unbecoming a police officer and of insubordination, and was ordered discharged from his position with the Police Department of the Village of Justice. Plaintiff appealed the decision of the Board to the Circuit Court of Cook County pursuant to the provisions of the Administrative Review Act, and the Circuit

Court held the findings of the Board to be against the manifest weight of the evidence, reversed the Board's order of discharge and reinstated plaintiff to his former position with the Police Department. Defendants appeal.

On October 27, 1966, four charges were filed against plaintiff by defendant Edward Naydeck, Chief of Police of the Village of Justice. The first charge alleged plaintiff was guilty of conduct unbecoming a police officer in violation of the rules of the Police Department, in that on the date of June 16, 1966, he made certain statements derogatory to the other members of the Justice Police Department, used profanity before a group of citizens, and interfered with officers of the Village Police Department while they were in the process of arresting Wayne Gasparas, plaintiff's son. The three remaining charges related to allegations of insubordination on plaintiff's part: that on October 13, 1966, plaintiff refused to obey an order given by Chief Naydeck that plaintiff turn over books, records and equipment belonging to the Village Police Department which plaintiff allegedly had in his possession during the six-year period plaintiff was the Chief of Police of the Village of Justice; that on the same date plaintiff refused to obey an order given by Chief Naydeck that plaintiff resign his position with the Fire Department of the Village of Justice in that the rules of the Police Department prohibited a police officer from also holding a position on the volunteer Fire Department of the Village; and that on the same date plaintiff further refused to obey Chief Naydeck's order that he submit to a fingerprint examination.

The first charge against plaintiff, that of his having engaged in conduct unbecoming a police officer, arose out of an incident which occurred on June 16, 1966, in the front yard of the home of Wayne Gasparas, plaintiff's son. Andrew Tomi testified that he was a Village of Justice patrolman and that at approximately 3:30 p. m. he had stopped an automobile for a traffic infraction on a

two-lane road in the Village and had pulled his marked squad car alongside the other vehicle in order to speak to the driver. The squad car and the vehicle Tomi had stopped were standing two abreast on the road and as Tomi engaged the driver in conversation, Wayne Gasparas stopped his automobile behind the vehicle Tomi had stopped and began blowing the horn of his automobile, telling the drivers of the vehicles in front to move on and shouting obscenities. Tomi told the other driver to proceed, alighted from his squad car and told Gasparas he was under arrest for disorderly conduct. Tomi testified that Gasparas then drove off and that he, Tomi, gave chase and radioed for assistance in order to effect an arrest.

As Gasparas turned his automobile onto the road running in front of his home, he was forced to stop due to a roadblock formed by a squad car operated by Village of Justice Police Officers Britton and Muscato. Other officers from the neighboring municipalities of Willow Springs, Hickory Hills and Bridgeview also appeared on the scene in marked squad cars, apparently in response to Tomi's radio request for assistance. Tomi testified that Gasparas alighted from his automobile and began walking toward his property, and that he and an officer from Willow Springs stopped Gasparas and informed him he was under arrest for disorderly conduct and reckless driving. Some words were exchanged between the officers and Gasparas, a struggle ensued and the officers attempted to place handcuffs on Gasparas in order to take him to the police station. Tomi stated that a large crowd of local residents had by then gathered at the scene. At this point plaintiff arrived dressed in civilian attire and driving his private automobile.

Tomi testified that plaintiff alighted from his automobile and began hollering, "Get your damn hands off my boy. What are you doing to him?" At another point in his testimony Tomi stated the plaintiff's comments at

this point were, "Get your goddamn hands off my boy. What the hell is going on here?" However, Tomi later testified that he was uncertain whether plaintiff used the term "goddamn" when he arrived on the scene and it was further brought out that Tomi, in his testimony at the trial of Wayne Gasparas on the charges of reckless driving, disorderly conduct and resisting arrest, made no mention of profanity having been used by plaintiff during the incident. Plaintiff also ordered that the single handcuff which the officers had succeeded in placing on Wayne Gasparas be removed.

Tomi also testified that plaintiff stated, after he had alighted from his automobile, that plaintiff was the only police officer at the scene and that he had papers in his automobile to prove it. It appears that Captain Gasparas and six other Village of Justice police officers were discharged from their respective positions on the force and that six other persons were appointed in their stead, the latter group apparently including witness Tomi. Captain Gasparas and the six other discharged police officers filed an action in the Circuit Court of Cook County for, among other relief, a writ of mandamus to require reinstatement of the seven men. It was stipulated at the trial that Gasparas was entitled to certification to civil service status with the rank of captain. The Circuit Court, on the day prior to the incident of June 16, 1966, ruled that the appointment as police officers of the second group of men (that group which apparently included Tomi) was null and void for failure on the part of the Village to conform to the statute relating to the appointment of policemen in municipalities having a population of over 5,000 persons. The Circuit Court's action in this regard was upheld by this Court in the recent case of People ex rel. Gasparas v. Gualano, 88 Ill App2d 227, 231 NE2d 669. Plaintiff thereafter stated that if an arrest were to be made that he, plaintiff, would drive Wayne Gasparas to the police station, which in fact was done.

Officer Britton of the Village of Justice Police Department testified at one point in the hearing that plaintiff stated, as he came onto the scene, "Take your hands off my son," but testified at another point that plaintiff stated, "Take your goddamn hands off my son." The officer further testified that a large crowd had gathered at the scene while the officers were attempting to arrest Wayne Gasparas and were hollering such things as "police brutality" and the like.

Officer Burda of the Willow Springs Police Department, one of the officers who responded to Tomi's radio request for assistance, testified that after the officers arrived at the home of Wayne Gasparas a crowd of some 100 persons had gathered nearby and that an "explosive situation" had developed; the people were attempting to interfere with the arrest of Gasparas and were accusing the officers of "running down their children." The officer stated that after plaintiff arrived he heard plaintiff say to Tomi that he, plaintiff, was the only police officer at the scene and had papers to prove it; the words were directed to Tomi and not to the crowd. Officer Burda did not testify that he heard plaintiff use profanity.

Officer Marcoline testified that he was a police officer of the Village of Hickory Hills and that he was one of the officers who responded to Tomi's radio request for assistance. He testified that when plaintiff arrived on the scene, plaintiff stepped between an officer present at the scene and Wayne Gasparas, stated he would take care of the matter and "said something to the effect that . . . the rest of the fellows there were not police officers, and he had papers in his car to prove it." The officer further testified that no one at the scene disputed plaintiff's authority at the time he said he would handle matters.

Joseph Kresser, Chief of Police with the Willow Springs Police Department, also responded to Tomi's radio re-

104

quest for assistance. Chief Kresser testified that he knew plaintiff to be the Captain of Police with the Justice Police Department. Chief Kresser left shortly after plaintiff arrived because, he testified, plaintiff was "superior officer at the scene."

William Jones testified that he lived next door to Wayne Gasparas and that he was present at the scene from the time Gasparas and the officers first arrived until Gasparas was taken to the police station by plaintiff. He stated he observed Tomi's squad car pursuing Wayne Gasparas' automobile and that the latter was forced to come to a stop due to a roadblock created by the squad car of Officer Britton. Several officers then dragged Gasparas from his automobile and threw him against the rear portion of the vehicle, and one of the officers "began kneeing him." The witness approached to within 10 feet of the officers and Gasparas, and shouted to them to stop. Plaintiff then arrived and told the officers present to remove the handcuffs from his son. By this time, Mr. Jones testified, a crowd of some 100 persons had gathered at the scene. Plaintiff then placed his son in his own automobile and drove him to the police station. The witness further testified that he heard plaintiff use no profanity at any time during the incident.

Wayne Gasparas testified that as he arrived at his home on the date in question he was unable to enter his driveway because Officer Britton's squad car was blocking it. Gasparas alighted from his automobile in the road, and Tomi told him he was under arrest but would not give a reason therefor. Officer Burda then told Gasparas to go to the police station to get the matter cleared up, which Gasparas agreed to do. The officers wanted Gasparas to ride to the station in a squad car, but Gasparas stated he would drive his own automobile. As he entered his vehicle, Gasparas testified, he was dragged from and pushed against the rear of the vehicle, and the officers attempted to handcuff him. One of the officers

105

was "kneeing" the witness. Plaintiff then arrived, ordered the handcuffs removed from the witness and took him to the police station. The testimony of Mrs. Nadine Gasparas, wife of Wayne Gasparas, was much the same as that of her husband and William Jones. She stated she did not hear plaintiff use profanity at the time he ordered the handcuffs removed from her husband and that plaintiff directed the remark that he was the only officer in the Justice Police Department to Tomi.

Plaintiff testified with regard to the June 16th incident that he was on his way to his son's home to check on some repair material he had ordered for the house and that when he arrived at his son's home he observed several squad cars nearby and his son standing near his automobile surrounded by several policemen. Plaintiff attempted to ascertain what was the matter, told one of the officers to remove the handcuffs from his son, and stated that if an arrest were to be made he, plaintiff, would drive his son to the station where the proper charges would be made. Plaintiff further stated he used no profanity during the incident and that he stated to Tomi and the officers from the other municipalities who were present at the scene that Tomi was not a police officer of the Village of Justice and that he, plaintiff, had "a court order to prove it."

With regard to the charges arising out of the conversation of October 13, 1966, between plaintiff and Chief Naydeck at the Village of Justice police station, the chief testified that on the morning in question he requested plaintiff to return files and equipment which plaintiff allegedly had in his possession during the period plaintiff was Chief of Police of the Village of Justice. The chief testified that plaintiff replied, "No, I'm not turning nothing [sic] in." Also present at the conversation was an ex-trustee of the Village of Justice, Robert Stuernfeldt. Chief Naydeck testified that the only items he specifically requested at the time were a "walkie-

106

talkie" set, several safety award plaques, and a typewriter. Other than the foregoing the chief was unable to specifically state what other "equipment and files" plaintiff had in his possession which the chief felt belonged to the Police Department.

Plaintiff testified that the typewriter was his personal property and that the "walkie-talkie" set was in a desk drawer in the police station, as were the safety award plaques which had been removed from the walls when the office was being decorated. Mr. Stuernfeldt testified that Chief Naydeck stated to plaintiff, "You have two walkie-talkies." Plaintiff's reply was, "Granted." When the chief asked plaintiff if he had a typewriter and an adding machine belonging to the Department, plaintiff replied, "No, I don't." Mr. Stuernfeldt testified that the matter "was dropped right there."

Chief Naydeck further testified that he asked plaintiff if he was still connected with the Village of Justice Fire Department and that he wanted plaintiff to "divorce" himself from the Fire Department for the reason that the rules of the Police Department did not permit such a double association. The chief testified that plaintiff replied, "Oh, no! I don't get paid for that. We will see about that." The chief stated plaintiff also replied, "We will wait and see."

Plaintiff testified that in July or August 1966 he requested from Mr. George Mack, Chief of the Village Fire Department, a leave of absence from the Department pending a determination of the validity of the requirement that policemen could not be associated with the Fire Department. George Mack corroborated this testimony, stating that plaintiff requested a leave of absence sometime during the second week in June 1966 for the same reason as that given by plaintiff at the hearing. The only evidence in the record that plaintiff was in any way actively associated with the Fire Department after he was granted the leave of absence and before the request

by Chief Naydeck to disassociate himself from the Department appears to have been in connection with the operation of a fire ambulance, on one occasion in July 1966, to the scene of an automobile accident after the accident was brought to his attention over the police radio. When he arrived at the scene plaintiff was advised by Chief Naydeck that an ambulance was not needed and he returned the vehicle to the firehouse.

Mr. Stuernfeldt testified that during the conversation of October 13, 1966, Chief Naydeck asked plaintiff if he was still with the Fire Department, to which plaintiff replied, "Yes." The chief then stated, "Well, you know what the rules are." Plaintiff replied, "Yes, I know." Mr. Stuernfeldt also stated that this was the extent of the conversation with respect to plaintiff's association with the Fire Department.

As to the final charge brought against plaintiff, Chief Naydeck testified that he requested a set of fingerprints from plaintiff to be taken by someone of the chief's choosing. The chief stated plaintiff refused to submit to an examination and offered him a set of fingerprints which had been on file with the Police Department prior thereto; the chief, however, stated he desired another set of prints. The set of fingerprints offered to the chief by plaintiff and introduced into evidence at the hearing before the Board is dated March 1962 and appears to be a properly authenticated set of plaintiff's fingerprints. The chief admitted in examination that a person's fingerprints do not change merely because of the aging of that person. Chief Naydeck stated that this was the extent of the conversation concerning the fingerprints because a person entered the station seeking information.

Plaintiff testified that the chief asked him for a set of his fingerprints and that he, plaintiff, secured a copy thereof from another office in the police station and gave them to the chief. Mr. Stuernfeldt's testimony concerning this segment of the conversation was substantial-

ly the same as Chief Naydeck's, adding only that plaintiff stated to the chief that only one set of fingerprints was required.

 While the findings and conclusions of an administrative agency on questions of fact are presumed to be prima facie true and correct, a court of review is required to consider the entire record in determining whether the findings are against the manifest weight of the evidence. Nolting v. Civil Service Commission of City of Chicago, 7 Ill App2d 147, 158, 129 NE2d 236. As stated in Welch v. County Board of School Trustees of Peoria County, 22 Ill App2d 231, 160 NE2d 505 at pages 236–237:

> ". . . the findings of an administrative agency must be supported by *substantial evidence*, and . . . the court has power to review all questions of law and fact presented by the record. Where it is found that the order of an administrative agency is without substantial foundation in the evidence, it is the duty of the courts to set it aside. Illinois Cent. R. Co. v. Illinois Commerce Commission, 395 Ill 303, 70 NE 2d 64."

 The Board of Fire and Police Commissioners of the Village of Justice found with regard to the charge of conduct unbecoming a police officer, that on June 16, 1966, plaintiff (a) interfered with police officers who were in the process of making a lawful arrest, (b) publicly stated that he was the only police officer in the Village of Justice, thereby deprecating and harming the effectiveness of the other members of the police force, (c) issued orders immediately upon arriving at the scene of the incident without first having ascertained the nature of the circumstances, and (d) used profanity before a large crowd of local citizenry. We are of the opinion that the trial court was correct in holding these findings to be against the manifest weight of the evidence.

Without entering a consideration of the alleged authority under which Andrew Tomi and the officers from the other municipalities acted in their attempt to effect an arrest of Wayne Gasparas, the evidence clearly shows plaintiff actually aided in, rather than interfered with the arrest. He succeeded in accomplishing this fact with dispatch and quite apparently without arousing the ire of the local citizenry as the other officers had done. It is undisputed that Wayne Gasparas and several officers were struggling prior to plaintiff's arrival, and the crowd which had gathered apparently had become incensed over the actions of the police. The crowd had become unruly and was attempting to interfere with the actions of the officers, accusing them of brutality and of running down their children. There was testimony that arguments began breaking out. Upon his arrival, plaintiff, as senior police officer at the scene, had a right under the circumstances to direct that order be restored, that the handcuffs be taken off Wayne Gasparas, and that he be permitted to take charge of the prisoner. From all the evidence it clearly appears that plaintiff's alleged "interference" in the arrest of Wayne Gasparas quelled, as one officer stated it, "an explosive situation" and that matters thereafter proceeded without incident.

The evidence with respect to the alleged use of profanity by plaintiff before a crowd of people is at best equivocal. Andrew Tomi's testimony vacillated on this issue. He stated first that plaintiff used the word "damn" when ordering the other officers away from Wayne Gasparas; he later stated that plaintiff used the words "goddamn" and "hell" at this time; finally, Tomi testified he was not certain whether plaintiff in fact used the word "goddamn." It further appears that Tomi made no mention of plaintiff's use of profanity during the incident when he testified at the trial of Wayne Gasparas on the charges of reckless driving, disorderly conduct, and re-

sisting arrest. The only other testimony with respect to the use of profanity by plaintiff was that of Officer Britton who testified plaintiff stated, as he alighted from his automobile, "Take your hands off my son." He later testified plaintiff stated, "Take your goddamn hands off my son." No other witness testified plaintiff used profanity during the incident.

With regard to the finding that plaintiff made statements tending to deprecate the standing of the other police officers in the Village, the weight of the evidence is that plaintiff stated to Tomi and the officers from the other municipalities present at the scene that he, plaintiff, was the only police officer at the scene and that he had a court ruling to prove same. The record does not disclose that plaintiff stated this fact aloud so that the entire crowd could hear, nor that the statement was intended to arouse the passion of the crowd. The record clearly discloses that no one questioned plaintiff's authority to act and take charge of the situation once he arrived on the scene, nor does it appear that anyone challenged plaintiff's statement that he was the only police officer in the Village.

██ As to the second charge, that plaintiff was guilty of insubordination, the Board found that on October 13, 1966, plaintiff (a) showed disrespect to a superior officer, Chief Naydeck, in failing to immediately carry out the chief's order to turn over books, equipment and records allegedly in his possession belonging to the Police Department, (b) failed to sever association with the Fire Department in accordance with the order of Chief Naydeck, and (c) failed to obey Chief Naydeck's order that plaintiff submit to a fingerprint examination. We are of the opinion that these findings are also against the manifest weight of the evidence, and that both the specifications made in support of the charge of insub-

ordination and the evidence in support thereof are insubstantial.

Chief Naydeck testified that he requested plaintiff to return files and equipment to the Police Department which plaintiff allegedly had in his possession during the years he held the position of Chief of Police, which request plaintiff refused to obey. The chief testified that he specifically requested plaintiff to return a "walkie-talkie" set, several safety award plaques, and a typewriter. It clearly appears that both the "walkie-talkie" set and the safety award plaques were in a desk drawer in the police station at the time the chief requested them, and it is not disputed that the typewriter was plaintiff's personal property. As to the chief's request for books and files, he did not detail to plaintiff what he was seeking at the time of the request, nor could he specify at the hearing what files he was seeking nor was it established whether such files were in fact in existence. The testimony of Mr. Stuernfeldt, a disinterested witness, was that Chief Naydeck matter-of-factly stated that plaintiff had a "walkie-talkie" set and that plaintiff replied, "Granted." He further testified that, after plaintiff denied having a typewriter and an adding machine belonging to the Police Department, the matter "was dropped right there."

Defendants maintain that plaintiff was guilty of insubordination in refusing to withdraw from the Village Fire Department upon order of Chief Naydeck. On the contrary, it is undisputed that plaintiff requested and was granted a leave of absence from the Fire Department sometime during the summer of 1966 pending the outcome of a determination of the validity of the very Police Department rule envoked by Chief Naydeck when he allegedly ordered plaintiff to "divorce" himself from the Fire Department. This is consistent with the chief's testimony that one of plaintiff's replies to his request was, "We will wait and see." It further appears from the

testimony of Fire Chief Mack that a vote by the entire Fire Department would be necessary to reinstate plaintiff on the force in the event he resigned, in view of plaintiff's age. Again, the testimony of Mr. Stuernfeldt concerning this portion of the conversation between plaintiff and Chief Naydeck was that the chief simply asked plaintiff if he was still connected with the Fire Department, and in response to plaintiff's affirmative answer thereto, the chief stated, "Well, you know what the rules are."

With respect to the final specification made in support of the charge of insubordination, that plaintiff refused to submit to a fingerprint examination at the request of Chief Naydeck, the evidence clearly shows that although plaintiff did refuse to be fingerprinted, he presented the chief with a set of fingerprints made less than five years earlier, which appear to be a completely authentic and valid set of plaintiff's fingerprints and which were on file in the Police Department. Inasmuch as the chief himself testified that a person's fingerprints do not change simply because the person grows older, it is difficult to understand why a second set of fingerprints would be necessary.

For these reasons the judgment of the Circuit Court is affirmed.

Judgment affirmed.

McNAMARA and LYONS, JJ., concur.