BELL REALTY AND INSURANCE AGENCY *et al.*, Plaintiff-Appellant, *v.* CHICAGO COMMISSION ON HUMAN RELATIONS *et al.*, Defendants-Appellees.

(No. 53171;

First District—January 8, 1971.

ENGLISH, J., dissenting.

Kal, Sutton & Knaus, of Chicago, (Tage Joranson, of counsel,) for appellant.

Raymond F. Simon, of Chicago, (Marvin E. Aspen and Robert J. Collins, of counsel,) for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

This is an appeal from an order of the Circuit Court dismissing plaintiff's suit for judicial review. Plaintiff, Juozas Bacevicius, a real estate broker and owner of Bell Realty and Insurance Agency, brought an action in the Circuit Court under the Administrative Review Act to review certain findings of the Chicago Commission on Human Relations. Complaints had been filed with the Commission, charging plaintiff with refusing to show residential listings to Lucille Gipson and Ernest Hamilton on the basis of their race, in violation of the Fair Housing Ordinance, Municipal Code of Chicago, ch. 198.7B. The ordinance provides that it shall be unlawful housing practice for any broker

"To deliberately and knowingly refuse examination of any listing of

residential real estate  *  *  *  to any person because of race, color, religion or national origin or ancestry."

After a hearing by a Commission examiner, the Commission adopted the examiner's findings, and plaintiff was found in violation of the ordinance as to both complaints. His real estate broker's license was then suspended by the Mayor for 90 days on each complaint, the suspensions to run concurrently. The trial court dismissed plaintiff's action for a judicial review, and he appeals, first contending; in effect, that the evidence introduced at the hearing does not support the Commission's findings, and secondly, that one who is testing an ordinance is not an aggrieved party within the meaning of the ordinance.

Patricia Ann Miller testified that she was a white person, and that, in the company of a white man on July 7 or 8, 1966, she visited the office of Bell Realty, located at 6455 South Kedzie Avenue, Chicago. A young lady employee asked them what they wanted, and they stated that they were looking for an apartment in the Gage Park area. Plaintiff's employee pulled cards out of a filing cabinet and began reading addresses of apartments available in the area. The employee informed them that if they wanted to take a list of apartments with them they would have to pay ten dollars. The witness was not actually looking for an apartment in the area, and never contacted Bell Realty again. She went there because two of her friends had been told that there were no apartments available.

Marilyn Fogel, a white person, testified that on July 8, 1966, she visited Bell Realty. She entered the office alone, and stated that she wished to buy a house. A young lady employee said that she handled rentals only, and that the witness would have to see one of the men in the back. One of the male employees came out, and the witness told him that her husband was outside parking the car and would be in shortly, and that they were interested in a two bedroom home in the Marquette-Gage Park area. He said that he had a house they would like. She picked homes out of a book, and the employee wrote several addresses of homes in which she expressed interest. At that time Sam Smith, a Negro, entered the office. He was a friend of the witness, but the employee assumed that he was her husband. After Smith appeared, all the homes mentioned by the salesman were east of Ashland Avenue, in Negro neighborhoods. She asked about the houses she saw originally, and the salesman made telephone calls, but informed them either the houses had been sold, the telephone line was busy or no one answered. She asked him about one house they would like to see, but the salesman said that he could not show it to them at that time because he could not

leave the office until another salesman arrived. She was testing, and did not actually intend to buy a home.

Diana Smith testified that she and another Negro friend went to Bell Realty on July 8, 1966. As they approached the receptionist, a man identified as plaintiff asked if he could help them. They asked for a listing of apartments, but were told that there were none. He inquired if they wanted anything east of Ashland Avenue but they replied no because they worked around Kedzie Avenue. He then stated that landlords did not want to rent to Negroes around Kedzie or California Avenues.

Ernest Hamilton, a Negro, testified that on July 12, 1966, he went to Bell Realty. The receptionist told him to be seated because she was busy. Two white people entered, and the young lady employee gave them rentals, and told them where apartments were available. When the other couple left, the witness told the girl that he was interested in buying a home. She replied that she did not handle sales, and that he would have to see one of the men in the office. Hamilton then asked about rentals, but was told that there were none, and that he would have to be placed on a list. Since he heard her give the white couple rentals, he inquired whether he was being refused rentals because he was a Negro, but she evaded the question. He left the office without leaving his name and address. He was not interested in purchase or rental; he was testing.

Lucille Gipson testified that she was a Negro, and that on July 22, 1966, she visited plaintiff's office. She had a conversation with plaintiff, and informed him that she was interested in a two-bedroom home in a good neighborhood, in the immediate vicinity. She meant a house in the Gage Park area. Plaintiff stated that he was no longer in the real estate business, and that he was restricted to selling insurance until a certain Supreme Court decision was handed down. He pointed out that the pictures of various homes for sale were turned to the wall, and that the lights on the real estate side of the office were turned off. As she started to walk out of the office, he said that he could give her two addresses, and that she could drive around and look at the two homes. That was the only conversation she had with plaintiff, and they did not discuss price, racial composition, or the number of people that were to live with her. She also testified that, of the two addresses given to her by plaintiff, one was in a predominantly Negro neighborhood and the other was in a changing neighborhood.

Plaintiff testified before the hearing examiner that he talked only to Lucille Gipson, and that he did not see or talk to any of the other

witnesses. He had only two active listings of the type of real estate in which she was interested, and he gave both to her.

Virginia Muscarella, a receptionist in plaintiff's office, testified that Ernest Hamilton was in the office only in August, 1966, and said that he was interested in buying a home.

Exhibits were introduced, showing that in July, 1966, plaintiff had placed advertisements in local newspapers seeking tenants for apartments in the Gage Park area.

At the conclusion of all the testimony, the hearing examiner filed a written report with the Commission. In the report, he found that at least one house listing was denied to Lucille Gipson because of her race. He further found that Hamilton was deliberately and knowingly refused a listing of apartments because of his race. The examiner further found that Hamilton was testing, that he was not actually interested in renting an apartment, but that this was irrelevant. The examiner also found that Hamilton's testimony was more credible than that of plaintiff's lady employee. The Commission adopted the findings of the hearing examiner, and recommended to the Mayor of Chicago that he suspend plaintiff's real estate broker's license for 90 days for failure to furnish a house listing to Lucille Gipson and for refusing an apartment listing to Ernest Hamilton. Thereafter, the Mayor entered the order of suspensions, with the direction that the suspensions run concurrently.

The purpose of the Chicago Fair Housing Ordinance, as stated in its Declaration of Policy, is to assure equal opportunity in housing, regardless of race. To fulfill this purpose, the ordinance makes it unlawful for a broker to discriminate in the sale, rental or financing of housing, or to refuse listings of any real estate, because of race, color, religion or national ancestry. The constitutional validity of this ordinance has been upheld in *Chicago Real Estate Board v. City of Chicago* (1967), 36 Ill.2d 530, 224 N.E.2d 793, and thus is not an issue on this appeal. However, contentions raised by the parties require us to consider the degree of proof and quality of evidence necessary to support a finding under the ordinance.

Court review under the ordinance is subject to the Administrative Review Act of Illinois. (Ill. Rev. Stat. 1965, ch. 110 par. 265. Municipal Code of Chicago, ch. 198.7B sec. 9.) Section 274 of the Administrative Review Act provides:

"The findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct."

In *Menning v. Department of Registration and Education* (1958), 14 Ill.2d 553, 153 N.E.2d 52, the court, at p. 558, stated:

"Although the findings of an administrative agency are deemed to be

*prima facie* true and correct, (*Parker v. Dept. of Registration and Education,* 5 Ill.2d 288; Ill. Rev. Stat. 1955, chap. 110, par. 274,) and although the provisions of the Administrative Review Act have been construed to mean that courts are not authorized to reweigh evidence or to make an independent determination of facts, (*Secaur v. State Civil Service Com.,* 408 Ill. 197,) it is equally true that the findings of an administrative agency and the order predicated thereon must rest upon competent evidence (*Novicki v. Dept. of Finance,* 373 Ill. 342,) and be supported by substantial evidence. (*Wallace v. Annunzio,* 411 Ill. 172). Upon judicial review, in other words, this court has the power to review all questions of law and fact presented by the record, our judicial function being comparable to the issue at law as to whether there is competent and substantial evidence to support a judgment of the lower court. (*Harrison v. Civil Service Com.,* 1 Ill.2d 137.)"

Accord, *Bruce v. Dept. of Registration and Education* (1963), 26 Ill.2d 612, 187 N.E.2d 711; *Gasparas v. Leack* (1968), 93 Ill.App.2d 99, 235 N.E.2d 359. Under these familiar principles, we must determine if the Commission's findings are supported by substantial evidence.

As to the failure to furnish a residential listing to Lucille Gipson, we hold that the finding of the Commission that plaintiff denied her a residential listing because of her race was not supported by any competent or substantial evidence.

In *Chicago Real Estate Board v. City of Chicago, supra,* the court stated that this section

"* * * provides only that real estate listings, which are ordinarily available to the public, be shown on a nondiscriminatory basis. Such listings may be refused on any ground other than race, color, religion or national origin, as designated in the law." p. 554.

Mrs. Gipson testified that when she entered plaintiff's office, she found that the pictures of various homes were turned away to the wall and that the lights on the real estate side of the office were turned off. Plaintiff then told her that he was out of the real estate business until a certain Supreme Court decision was handed down (apparently, the aforesaid *Chicago Real Estate Board v. City of Chicago case).* Thus complainant Gipson's own testimony indicated that plaintiff had, at least temporarily, suspended his real estate business.

As complainant was leaving the office, she was offered two real estate listings by plaintiff. While both listings were undesirable to her, she did not express any dissatisfaction with the two listings to plaintiff, nor did she make any request for additional listings. Moreover, she visited the office ten days after Hamilton had been there, and at least two weeks

after the other witnesses had been there. Consequently, there was no evidence presented that there was an availability of the type and location of housing in which she was interested.

■■ We conclude that the evidence presented did not support a finding that plaintiff refused Lucille Gipson a real estate listing because of her race.

Plaintiff next contends that the evidence was insufficient to support a finding that Hamilton had been refused an apartment listing because of race.

Hamilton testified that on July 12, when he first entered plaintiff's real estate office, he was told to be seated. As he waited, he observed that two white people entered and were given listings of available apartments. The same employee who furnished the apartment listings to the white couple then informed Hamilton that there were no apartments available. She informed him that he would have to be placed on a list. When Hamilton asked her if she was refusing to show him a listing because he was a Negro, he testified that she evaded the question.

■■ In light of the Commission's determination that Hamilton's testimony was more credible than that of plaintiff's employee, we conclude that the evidence presented supports a finding that Hamilton was refused a listing of apartments because of his race. After Hamilton overheard plaintiff's employee give listings to a white couple, that same employee told Hamilton that there were no listings available. Although Patricia Miller was informed that a written listing of apartments would cost her ten dollars, she had been informed orally as to the addresses and availability of numerous apartments. Hamilton was not even told that he could obtain a written listing for ten dollars. The employee's first statement to him about apartments was that there were none available. Her unwillingness to deal with him because of his race is apparent.

Plaintiff, however, contends that Hamilton was not aggrieved within the meaning of the ordinance in question because he testified that he was testing for compliance to the ordinance, and not really interested in renting an apartment or in purchasing real estate. Section 6 of the Ordinance in question provides:

"Any person aggrieved in any manner by any violation of any provision of the above ordinance may file a written complaint * * *."

■■ A reading of the Ordinance indicates that, like other administrative agencies, the Chicago Commission on Human Relations acts only in the interests of the public, and has no power, under this ordinance, to provide any private remedies against the real estate agency charged with wrongdoing. (Cf. *American Airlines v. North American* (1956), 351 U.S. 79.) Thus the person initiating a complaint does not become a

party to the proceeding or exercise any control over it. *Amalgamated Utility Workers (C.I.O.) v. Consolidated Edison Co. of New York* (1940), 309 U.S. 261.

■■ Whether Hamilton suffered any pecuniary damages as a result of being refused apartment listings is irrelevant. The ordinance in question is designed to prohibit real estate brokers from denying listings to a person because of his race or color, and not to provide private remedies to a person who was denied a listing. We conclude that, where a person who was denied a listing of apartments admits that he was testing for compliance to the ordinance, such an admission does not preclude a finding that he was denied a listing because of his race, and that therefore the real estate broker was in violation of the ordinance. The fact that a person was testing is an evidentiary fact. The evidence in the instant case supports the conclusion that the broker was not aware that Hamilton was testing, and the further conclusion that Hamilton was denied a listing solely because of his race.

In his reply brief, for the first time, plaintiff contends that the complaint signed by Hamilton was at variance with the findings of the Commission. Plaintiff raised no such objection during or after the finding by the hearing examiner and the Commission. In his complaint for judicial review, plaintiff again failed to allege any variance; he did not raise this issue during the trial, in his post-trial motion, or in his original brief. The issue of the variance between the Hamilton complaint and the Commission findings is raised for the first time during the entire proceedings in plaintiff's reply brief.

Supreme Court Rule 341(e) (7), Ill. Rev. Stat. 1967, ch. 110A par. 341(e) (7), provides as follows:

"Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."

■■ In commenting upon the rule, in *Gouker v. Winnebago County Board of Supervisors* (1967), 37 Ill.2d 473, 228 N.E.2d 881, the court, at p. 476, stated:

"The obvious purpose of the rule is to have counsel present in his opening brief those points raised in his complaint upon which he wishes to be heard and those which he does not include are waived."

Moreover, an issue not presented to and considered by the trial court cannot be raised for the first time on appeal. *Woman's Athletic Club of Chicago v. Hulman* (1964), 31 Ill.2d 449, 202 N.E.2d 528.

■■ We recognize the principle that a waiver should only be considered when consistent with a just result. *Hux v. Raben* (1967), 38 Ill.2d 223, 230 N.E.2d 831. However we conclude that in the instant case, plaintiff has not suffered any prejudice by the claimed variance, and that

the point was waived. The complaint signed by Hamilton was as follows:

"I went to the office of Bell Realty and Insurance Agency and inquired about the purchase of a four bedroom house in the Gage Park area. The employee with whom I spoke said she only handled rentals. I then inquired, since she didn't handle sales what rental units were available. She replied that she would have to put my name on the waiting list.

I believe I was denied the opportunity of purchasing a home because of my race."

The hearing examiner made a specific finding which was adopted by the Commission that Hamilton was knowingly refused a listing of apartments because of his race. The complaint on its face clearly reveals that plaintiff was effectively informed of the entire occurrence. Hamilton was claiming discrimination as to both purchase and rental. Plaintiff had a full opportunity to, and in fact, did, present evidence completely contradictory to Hamilton's testimony. Since plaintiff has raised the issue for the first time in his reply brief, did not present the issue either to the Commission or to the trial court, and has failed to show how he was prejudiced, we conclude that he has waived the point.

The judgment of the Circuit Court upholding the 90 day suspension of plaintiff's real estate broker license as to the complaint signed by Ernest Hamilton is affirmed. The judgment of the Circuit Court upholding the 90 day suspension as to the complaint signed by Lucille Gipson is reversed.

Affirmed in part; reversed in part.

STAMOS, J., concurs.

Mr. JUSTICE ENGLISH, dissenting:

I would reverse the judgment as to both complaints.

The Hamilton complaint—which must be considered as the basic pleading which makes the charge against Bell Realty—is set forth in the majority opinion. It consists of five sentences. The first two allege that Hamilton asked about the purchase of a four-bedroom house in Gage Park, and was told by the clerk that she handled only rentals. In the last sentence of the complaint, which constitutes its only charging part, Hamilton alleges that he was denied the opportunity of purchasing a home because of his race. It appears obvious to me, as it must have to the Hearing Examiner, the Commission, the Circuit Court, and to the majority of this court, that the charge made was established by neither the allegations of fact nor the evidence introduced to support it.

The other two sentences of the complaint allege that Hamilton asked the clerk what rentals were available, and was told that his name would

have to be put on a waiting list. Nothing more is alleged in regard to rentals. It is not charged that the maintenance of a waiting list for rentals constitutes a violation of the ordinance, nor is it charged by any language whatsoever that Hamilton was refused a rental listing because of his race. I believe that the complaint is therefore wholly defective and insufficient to support the finding of the Hearing Examiner (adopted by the Commission) that Hamilton "was deliberately and knowingly refused examination of listing of apartments because of his race or color."

The majority say that this point was waived because not raised soon enough, citing Supreme Court Rule 341(e) (7). The Supreme Court considered the essential character of this rule and other rules in *Hux v. Raben*, 38 Ill.2d 223, 224-225, where it concluded:

"These provisions recognize that the responsibility of a reviewing court for a just result and for the maintenance of a sound and uniform body of precedent may sometimes override the considerations of waiver that stem from the adversary character of our system."

I deem that statement to be applicable here.

Even if the Hamilton complaint were considered adequate, I also believe that the evidence failed to establish a violation of the ordinance as to him. In this, it must be borne in mind, of course, that the quantum of proof required in an ordinance penalty case is more than a "mere preponderance" of the evidence; a violation must be shown by a "clear preponderance" of the evidence. *City of Rockford v. Maxwell*, 92 Ill. App.2d 336, 340; *City of Chicago v. Williams*, 45 Ill.App.2d 327, 329; and *City of Chicago v. Carney*, 34 Ill.App.2d 303, 305-306.

Hamilton testified that after he had overheard the clerk giving a white couple some information about rental listings, he inquired about the purchase of a four-bedroom house in the $18,000 to $24,000 price range. On being told he would have to talk to the man who was busy at the time (the same answer given to the white witness Fogel who asked to purchase a home), he then asked if there was anything available in rentals. The clerk replied that there was not, and when Hamilton pointed out to her that the couple had just been given rental listings, and asked if he was being refused because he was a Negro, she "went on and on in giving 'You have to be placed on the list,' and so on." His further testimony that she had thus "evaded the question" was no more than his own conclusion based on her having told him of the need to be on a waiting list. This conclusion must also be considered in the light of the complaint which recited his inquiry about rentals and then stated very simply: "She replied she would have to put my name on the waiting list."

Proof was thus made that a white couple were given rental listings,

but there was no proof that they had not been on a waiting list. Nor was there any proof that the apartments listed were in Gage Park. The record is also devoid of testimony concerning the availability of apartments in Gage Park, from which it could be determined that there was anything improper about the fact of a realtor's maintaining a waiting list. What proof there is on this point in the newspaper advertisement exhibits is in favor of Bell.

Commission's Exhibit 6 consists of four small classified advertisements of "Bell Agy." purportedly clipped from the Southwest Herald. They advertise apartments for rent, but their locations are not in Gage Park, and they bear no dates. Certainly, there is no significant probative value in these clippings which are not related in either time or place to the issue in question.

Commission's Exhibit 7 is a full page of classified advertising of the Southwest News-Herald for July 21, 1966. Since the Hamilton episode took place on July 12, and since there was no testimony comparing the market in Gage Park on the two dates, this exhibit, too, fails to prove what the Commission sought by its introduction. However, it is interesting for what it may be worth, as the only two rental advertisements of Bell were, again, for apartments outside Gage Park. The third Bell advertisement is in the "Wanted to Rent" column, and reads:

FREE RENTAL SERVICE
CHOICE TENANTS WAITING.

In the same exhibit, competitors of Bell were also advertising in a way which indicates to me that waiting lists were a recognized practice at the time. The advertisements of three other real estate firms included:

Choice Apts. Are Scarce!!!
Register Now!!

Married Soon?

Register Now.
Landlords—Free Service
Screened Tenants Waiting.

Free Fast Service, Call Today
We have over 100 tenants waiting
for apartments & houses.

Free Service to Landlords
Help! 100 Tenants Waiting.

I conclude from these exhibits that there is no reasonable inference of discrimination to be drawn from the clerk's having told Hamilton that his name would have to be placed on a waiting list.

Furthermore, he was not denied a place on the list, as he never gave his name to the clerk for a waiting list or for any other purpose, the reason obviously being that he was actually not wanting to buy or to rent at all, but was simply "testing." If he had requested and been refused a place on the waiting list, the situation would have been quite a bit different.

The wholly admirable policy of the City, and the expressed purpose of the ordinance, is to assure equal opportunity to all residents, without discrimination because of race, "to obtain fair and adequate housing for themselves"; and to prohibit owners and their agents from refusing to rent housing accommodations to any person because of race. Chicago Fair Housing Ordinance, Sections 1 and 2. The specific acts prohibited, including that complained of in this case, ought to be examined, not isolated out of context, but in the light of this declared policy of the ordinance. By his own testimony it is conceded that Hamilton was not "denied the opportunity of purchasing a home because of [his] race," even though he swore to the complaint alleging that he was. Neither was he denied the opportunity to rent an apartment, because he did not want to buy, and he did not want to rent. I therefore believe that Hamilton was not a "person aggrieved," who alone is authorized to file a complaint under the ordinance. I respectfully suggest that the majority do not answer this question when they point out that the Commission has no power to provide private remedies against a realtor, and that a complainant may not exercise control over the proceeding after it has been initiated by him. I agree that proof of pecuniary damages to Hamilton would not be necessary, but one in his position, under the circumstances of this case, is still not an "aggrieved person" within the intent of the ordinance. We have been directed by the Commission to no case in point, and are aware of none. The Commission does cite *Commission on Human Rights v. Knox Realty Corp.*, 290 N.Y.S.2d 633, but that case involved an actual refusal to a Negro of a specific apartment which was subsequently made available to a white person. *Filippo v. Real Estate Commission of the District of Columbia*, 223 A.2d 268, concerned the actual sale of housing to Negroes at higher prices.

I have no doubt that the City Council became satisfied, from its investigation of the facts, that there was a need for the Fair Housing Ordinance. This being true, the Commission must have received many discrimination complaints from persons who in good faith were seeking housing accommodations. I find it difficult to understand, therefore, why there would be prosecution of a doubtful case such as this which certainly borders on the hypothetical and the moot.